No. 42,880

GEORGE E. FAILING COMPANY, *Appellant,* v. CARDWELL INVESTMENT COMPANY, INC., *Appellee.*

(376 P. 2d 892)

Opinion filed December 8, 1962.

*Harry L. Hobson,* of Wichita, argued the cause, and *Emmet A. Blaes, Roetzel Jochems, Robert G. Braden, J. Francis Hesse, James W. Sargent, Stanley E. Wisdom, Cecil E. Merkel, Bruce W. Zuercher, L. D. Klenda, Loren B. Corliss* and *Charles M. Cline, Jr.,* all of Wichita, were with him on the brief for the appellant.

*William Tinker,* of Wichita, argued the cause, and *Arthur W. Skaer, Hugh P. Quinn, Alvin D. Herrington* and *Richard T. Foster,* all of Wichita, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action upon a guarantor's written promise to pay the appellant for goods purchased by and delivered to a third party.

The overall question presented is whether the rental of oil well pipe by the third party from another company, but billed through the appellant, was covered by the guaranty.

The facts are rather involved and require the recital of some background information presented by the record to clarify the issue.

The Cardwell Investment Company, Inc. (appellee) is a Kansas corporation with its principal office in Wichita, Kansas. H. W. Cardwell was the active head of the company in 1957.

Several years before the transaction in question took place, Floyd McPeters, a drilling contractor, bought a drilling rig from the Cardwell Manufacturing Company under a conditional sales contract, upon which there was an unpaid balance yet owing to the Cardwell

Investment Company. The Cardwell Investment Company is the corporate successor of the manufacturing company.

McPeters, doing business as Mac's Drilling Company, obtained a contract to drill an oil well in the state of Utah near Grand Junction, Colorado, but was without operating funds. McPeters arranged to have the owners of the well send to the Cardwell Investment Company the money to be paid him from drilling the well. Cardwell in turn was able to make payment of any bills which McPeters asked Cardwell to pay.

The George E. Failing Company (appellant) with its principal office at Enid, Oklahoma, manufactures portable drilling equipment and distributes oil field supplies through company-owned branch stores, one of which is at Grand Junction, Colorado. Failing's credit experience with McPeters had been unsatisfactory, and as a result McPeters called Cardwell and asked him to make arrangements.

On or about August 1, 1957, Edward A. Johndrow, vice president of sales for the George E. Failing Company, called H. W. Cardwell in Wichita from his office in Enid, Oklahoma, and advised Cardwell that Floyd McPeters was in the George E. Failing Company store at Grand Junction, Colorado, wishing to purchase equipment and supplies for use with a Cardwell rig, and further informed Cardwell that McPeters indicated he had an arrangement with Cardwell by which Cardwell would guarantee McPeters' obligations. There was no discussion as to what was to be included in the guaranty. The conversation lasted no more than two or three minutes.

The terms and conditions of the guaranty of McPeters' purchases from the George E. Failing Company are found in the correspondence which followed the conversation between Cardwell and Johndrow. On August 6, 1957, Mr. Johndrow wrote Mr. Cardwell a letter in which he stated:

"This letter will confirm our telephone conversation of August 1, in which I understood you to say that your good company would be responsible for purchases made by Floyd McPeters through our company.

"It was our understanding that we should bill Mr. McPeters at 329 Belford Avenue, Grand Junction, Colorado, but we should mail the invoices to your company for payment.

"Would you please confirm that we are in agreement on this matter."

By letter dated August 13, 1957, Mr. Cardwell replied as follows:

"We acknowledge your letter of August 6, 1957 regarding Floyd McPeters.

"This will confirm our agreement with the exception that we ask that you

send all invoices to Mr. McPeters for his approval and he in turn will send them to us for payment."

A postscript was added:

"Please mail copies of invoices to us as made for our knowledge of what is purchased." (Emphasis added.)

On August 20, 1957, Raymond Leverich, director of finance and tax for the George E. Failing Company, wrote a reply letter to Mr. Cardwell, reading:

"During Mr. Johndrow's absence from the office I am taking the liberty to advise you that all invoices will be handled from this office as instructed in your letter of August 13 by sending Mr. McPeters, for his approval, the original together with his file copies.

"He will approve the original and forward to you for payment."

A postscript, added for the attention of C. Cook, store manager in Grand Junction, Colorado, and others, reads as follows:

"In Mr. Johndrow's initial instruction the original of the invoice was to go to H. W. Cardwell for payment but upon request he is to receive a copy of the invoice while the original and extra copy will go to Floyd McPeters for his approval so that he may send the approved original to Cardwell for payment."

Invoices from the Grand Junction yard of the George E. Failing Company to Floyd McPeters on the well in question amounted to a total of about $15,000. Invoices for purchases made were approved by McPeters and mailed to Cardwell's office at Wichita, Kansas. The invoices were generally signed by McPeters, most of them bearing the notation "O. K." before his signature. A few came to Cardwell that McPeters had approved over the telephone in talking with Cardwell, particularly when a cash discount could be taken by prompt payment. Cardwell testified that it was McPeters' money he was spending and he had no way to know whether the bills were correct except by McPeters' approval. Cardwell did not pay any invoices under this arrangement without McPeter's approval.

The controversy between Failing and Cardwell is centered around certain drill pipe rented by McPeters from Tom Ray Field Rentals, Inc. of Farmington, New Mexico, for use from August 17, 1957, to September 29, 1957. Mr. Cardwell knew McPeters had rented drill pipe, but at the time McPeters rented the pipe he had told Cardwell by telephone he would not need his help in getting it. McPeters did not rent this pipe from the Failing Company.

Thereafter, on October 21, 1957, Tom Ray addressed his invoice to the Failing Company in the amount of $4,559.13 for the rental of the pipe. Cardwell did not know of this invoice. Cardwell still

had, at that time, just enough money on hand belonging to Mc-Peters to pay the amount McPeters thought would be charged for the rental of the pipe.

On November 5, 1957, Cardwell talked to Mr. Little of Tom Ray Rentals for the purpose of getting McPeters and Tom Ray together to settle the amount owing for the rental so that Cardwell might get from the owners of the well their final payment of $5,000 and conclude the transaction. Cardwell had no information that the rental had been billed to Failing at that time, or that Tom Ray was even trying to collect it through Failing. Cardwell thereafter learned of Failing's involvement and he contacted Mr. Cook. The Failing Company was also trying to get this matter settled between Tom Ray and McPeters.

Calvin Cook, manager of the Failing store at Grand Junction, Colorado, on November 22, 1957, wrote a letter to Mr. Cardwell, stating in part:

". . . Just to clear up the misunderstanding—I did not rent the pipe, Floyd McPeters rented it. I just allowed them to bill us for the rental since Mr. McPeters had no credit with their company. Mr. McPeters will go to Farmington shortly and see if he can get them to reduce the figure of $4,559.13. . . ."

The Tom Ray statement for pipe rental was reduced to the total amount of $3,962.83, and the rental period shortened by four days, as shown by its revised invoice dated January 8, 1958, and again directed to the George E. Failing Company.

On March 19, 1958, R. L. Jones, credit manager of the George E. Failing Company, wrote a letter to Cardwell, stating in part:

"I understand there was some question on the rental of this pipe. *Our store manager at Grand Junction, Mr. Calvin Cook, merely assured Mr. Bill Little of Tom Ray Rentals, Inc., that we would guarantee payment of the rental of the pipe and he did this based on your letter dated August 13, 1957, to our Mr. A. E. Johndrow confirming the agreement set forth in his letter to you dated August 6, 1957,* that you would be responsible for any obligation that Mr. McPeters might incur on the Handcock well." (Emphasis added.)

At about the same time Cardwell received an invoice from Failing dated March 14, 1958, addressed to Mac's Drilling Company for rental of drill pipe in the amount of $4,477.95. The bill had not been approved by McPeters, orally or in writing, and Cardwell did not know if McPeters had paid it. The amount of the invoice was ten percent greater than Tom Ray's statement to Failing, reflecting Failing's commission on the rental. *This was the first and only in-*

*voice Cardwell received concerning the rental of the pipe, seven months after the drill pipe was procured for use.* This invoice was sent to McPeters by the Failing Company at Grand Junction, Colorado, and at Seguin, Texas, and it was returned to Failing, indicating that McPeters had not received it. McPeters could not be found by the appellant until after the trial of this case.

On June 11, 1958, E. A. Johndrow wrote a letter to Cardwell in which he stated:

"As to the drillpipe, we explained to you that we were really caught between two fires: Tom Ray, the supplier, on one hand, and the contractor who ordered this and whom you sponsored, on the other. We also advised you that Tom Ray, through his attorney, informed us that unless we paid the account we were going to be sued; we expressed the feeling that this was unfair as your letter of August 13 guaranteed the McPeters purchases without reservation as to amount or type of purchase. From your reply, we were surprised to learn that you felt that this was a put-up deal between Tom Ray's man and our man about the drillpipe . . ."

In response Cardwell wrote a letter to Mr. Johndrow on June 23, 1958, reading:

"Please refer to Mr. Cook's letter of November 22 which states, 'I did not rent the pipe, Floyd McPeters rented it.' I called Tom Ray Rental Co. trying to get them to tell us the amount of the rental in order to help Floyd McPeters, who advised us he had rented the pipe and they had charged him too much. At that time, we had just enough money on hand, belonging to Mr. McPeters, to pay the amount he thought would be charged for the rental. However, other bills came in and we paid them at the request of Mr. McPeters. Now there is no money left, not even any to pay your claimed balance of $1,184.85."

Mr. Cardwell received all of the money that the people who owned the well paid for the drilling of it, and he expended the money as McPeters authorized him. It was gone before he paid the last bill of $1,100 with the Failing Company. He did, however, pay the remaining bill of approximately $1,100 owing to the Failing Company by reason of his guarantee to pay for the supplies that McPeters bought from that company. All of the invoices mailed to Cardwell by Failing, other than the one for pipe rental, were paid by Cardwell.

According to the testimony of Mr. Cardwell, none of McPeters' bills paid through his office was for items rented, to his knowledge. Apparently, one or two of the numerous invoices handled by Cardwell turned out to have been for drill bits obtained on a lease basis by McPeters directly from Reed Roller Rock Bit Company or

Hughes Tool Company, and billed through the George E. Failing Company. These invoices, however, appear to indicate a sale of the items by the George E. Failing Company to Mac's Drilling Company. Cardwell had no notice that the George E. Failing Company did not stock such bits.

Two invoices from the George E. Failing Company to Mac's Drilling Company are for freight charges by Jess Edwards, Inc. and Ferguson Trucking Company, Inc. to haul drill pipe and other equipment. The pipe was not identified on the invoice as having been rented, and Cardwell did not know what pipe it was. It turned out to be the pipe which McPeters had rented from Tom Ray Field Rentals, Inc. A portion of the freight costs was paid by Cardwell directly to Jess Edwards, Inc., but Cardwell did not pay a single invoice without McPeters' approval, either in writing or over the telephone.

Tom Ray Field Rentals, Inc. recovered a judgment on May 18, 1959, against the George E. Failing Company in the United States District Court in Texas in the amount of $3,962.83, and Failing satisfied that judgment. Failing then filed this action against Cardwell. Trial was to the court on May 19, 1961, and judgment was entered for the defendant, Cardwell Investment Company, Inc. upon a general finding by the trial court in its favor on all points. Special findings were not requested.

The trial court in announcing its decision from the bench construed the agreement on the part of the appellant to "send all invoices to Mr. McPeters for his approval" as a condition precedent to payment by Cardwell, and being a condition precedent no obligation arose unless such approval was first obtained.

After post-trial motions, appeal was duly perfected to this court.

The appellant undertakes to present four questions which are stated as follows:

"1. Whether Appellee's Request That Appellant 'Send All Invoices to McPeters for His Approval' Was Fulfilled When Appellant *Sent* Such Invoices to McPeters for His Approval.

"2. Whether McPeters Could Withhold Specific Written Approval When He Had Used the Goods and Services Without Objection.

"3. Whether Appellee, Who Talked to McPeters 'Two or Three Times a Week' on Various Invoices and Paid Some Invoices Without Specific Written Approval of McPeters, Could Insist on Specific Written Approval on the Invoice in Question.

"4. Whether Specific Written Approval of McPeters, After His Disappear-

ance and Extended Absence, Obtained by the Appellant During the Same Term of Court As the Adverse Judgment Rendered Against It, Was Sufficient Evidence to Justify a New Trial."

It is the appellant's contention on the first question that its obligation to send an invoice for approval was fulfilled when the invoice was deposited in the United States mails addressed to the party receiving the goods and services. It is argued *the opportunity* for approval on the part of Mr. McPeters was sufficient; that to hold otherwise would thwart the real understanding of the parties, since the appellant would not have done business with McPeters, except for the agreement by the appellee to be responsible for such purchases. The appellant calls our attention to the fact that no limitation was placed upon this understanding, even as to the amount to be purchased or the time during which such purchases would take place.

There was little controversy in the evidence presented at the trial of this case, and fact questions, if any, were resolved by the trial court in making a general finding in favor of the appellee. The factual statement of the case is supported by the evidence and has been stated most favorably for the appellee.

We are therefore confronted with a question of law—the legal import of the guaranty agreement between the parties.

The questions raised by the appellant, in our opinion, seek to deal with legal points but tend to ignore the vital facts and thus fall on the periphery of the case. The Failing Company was involved with the drill pipe in only one respect—it guaranteed McPeters' payment of the rental for which it was to receive, in effect, a commission of ten percent on the amount charged McPeters on the rental. In substance, the Failing Company seeks to obligate Cardwell for a guaranty Failing made to Tom Ray Field Rentals, Inc. on drill pipe McPeters rented from Tom Ray, admittedly on the force of Cardwell's guaranty to Failing for purchases made by McPeters through the Failing Company's Grand Junction store.

The liability of a guarantor upon an obligation cannot be extended by implication, and he should not be held beyond the precise terms of his contract. (*Kepley v. Carter*, 49 Kan. 72, 30 Pac. 182; and *Bank v. Bradley*, 61 Kan. 615, 60 Pac. 322.) The same rule was stated in *Dry Goods Co. v. Yearout*, 59 Kan. 684, 54 Pac. 1062, in the following language:

". . . A contract to pay the debt of another should not be expanded beyond the fair import of its terms. A guarantor, like a surety, is a favorite of

the law, and he is not held unless an intention to bind himself is clearly manifested; and his liability is never to be extended beyond the precise terms of his obligation. . . ." (pp. 685, 686.)

The contract of guaranty here in question is analogous to a letter of credit, which is defined as a written instrument by which the writer requests or authorizes a person to whom it is addressed to pay money or deliver goods to a third person, and which evidences an agreement whereby the writer assumes responsibility for the payment to the addressee of the amount of the debt. (24 Am. Jur., Guaranty, § 20, p. 888.)

The measure of liability of one who has issued a letter of credit is to be determined primarily by consideration of the terms and provisions of the letter. Thus, a person issuing a letter of credit incorporating conditions upon which liability thereon shall accrue is liable only where such conditions have been met. (24 Am. Jur., Guaranty, § 23, p. 890.) Furthermore, the liability of the guarantor depends upon conformity with the procedural terms set forth in the letter of credit. If its provisions have not been met, the letter affords no security. (24 Am. Jur., Guaranty, § 25, p. 891.) *Stough v. Healy*, 75 Kan. 526, 89 Pac. 898, is a case which illustrates the enforcement of a construction strictly in accordance with the terms of such an arrangement.

Even compensated guarantors are not liable when the original contract on which their undertaking was made is materially changed without their assent. A gratuitous or accommodation guarantor is discharged by any change, material or not, and even if he sustains no injury by the change, or if it be for his benefit, he has a right to stand upon the very terms of his obligation and is bound no further. The guarantor is at least entitled to notice of change and the attempt to increase his burden and his chances of loss. *Magazine D. Pub. Co. v. Shade et al., Aplnts.*, 330 Pa. 487, 490, 199 A. 190, 117 A. L. R. 960.)

In the instant case the terms of the guaranty contained in the letters are neither ambiguous nor inconsistent. The law views with a jaundiced eye any attempt to vary by parol evidence the terms of a written contract. This is particularly true with respect to a written contract of guaranty, inasmuch as the nature of the transaction makes it subject to the statute of frauds. (G. S. 1949, 33-106.) If the language of the contract of guaranty is clear and leaves no doubt as to the parties' intention concerning the measure of the

guarantor's liability, the guarantor cannot be held liable in excess of the limitations that the contract language imposes. The character of the credit given in a written guaranty, which is complete in itself, cannot be explained by parol evidence. (24 Am. Jur., Guaranty, § 57, p. 911; and § 121, p. 952.)

Delineating the application of the foregoing rules to all of the facts and ramifications in the instant case would be purely academic in view of one point, which determines this case and overshadows all other questions. This point relates to Failing's delay in the submission of a copy of the invoice in question to Cardwell. By the terms of the contract Failing agreed to submit all invoices to Mr. McPeters for his approval, and at the same time mail copies of all invoices to Cardwell *"as made" for Cardwell's knowledge of McPeters' purchases through Failing.* The postscript to Failing's letter dated August 20, 1957, added *for the attention of C. Cook,* its store manager in Grand Junction, Colorado, directed that Cardwell was "to receive a copy of the invoice while the original and extra copy will go to Floyd McPeters for his approval so that he may send the approved original to Cardwell for payment."

The general finding of the trial court established that Cardwell had no information the drill pipe rental in question had been billed to Failing, or that Tom Ray Field Rentals, Inc. was even trying to collect it through Failing. The *first and only invoice* Cardwell received from Failing concerning the rental of the pipe was dated March 14, 1958, seven months after the drill pipe had been procured by McPeters for his use. This extended delay in the submission of an invoice to Cardwell by Failing was clearly not within the written terms of the guaranty contract. We hold that Failing was required under the written terms of the guaranty to make a reasonably prompt submission of all invoices by sending a copy to Cardwell for his knowledge of McPeters' purchases through Failing, if Failing sought to obligate Cardwell on the guaranty.

It may be conceded that the contract of guaranty specified no limitation as to the amount McPeters might purchase through the Failing Company or the time during which such purchases could be made, but this does not preclude a reasonably prompt submission of copies of invoices for which purchases were made through Failing.

An analogous situation is found with respect to the time for presentment of a check for payment which has been drawn upon a

bank. (G. S. 1949, 52-1703.) A check must be presented for payment within a reasonable time after its issuance or the drawer will be discharged from liability thereon to the extent of the loss caused by the delay.

In view of our decision on the foregoing point it becomes immaterial to consider other points raised by the appellant.

Accordingly, the judgment of the trial court is affirmed.