No. 61,847

OVERLAND PARK SAVINGS AND LOAN ASSOCIATION, *Appellant*, v.
DAVID K. MILLER, *et al.*, *Appellees*.

(763 P.2d 1092)

Opinion filed
October 28, 1988.

*David L. Skidgel*, of McAnany, Van Cleave & Phillips, P.A., of Kansas City, argued the cause, and *Betsy J. Morgan*, of the same firm, was with him on the briefs for appellant.

*Robert J. Campbell*, of Brown, Koralchik & Fingersh, of Overland Park, argued the cause and was on the brief for appellee David K. Miller.

*Timothy M. O'Brien*, of Shook, Hardy & Bacon, of Overland Park, argued the cause, and *Ron Bodinson*, of the same firm, was with him on the brief for appellee R. Richard Lashbrook.

*Richard H. Seaton*, of Everett, Seaton & Miller, of Manhattan, argued the cause and was on the brief for appellee Charles H. Hostetler.

The opinion of the court was delivered by

MCFARLAND, J.: This is an action by a lending institution against individual guarantors of a corporate nonrecourse real estate development loan. The district court entered summary

judgments in favor of the defendant guarantors and the lending institution appeals therefrom.

The facts underlying this litigation are lengthy and complex but must be recited herein in considerable detail. To make their reading more meaningful it is helpful to state, at this point, the three primary grounds upon which the district court's decision rests, as follows:

1. The guarantors were guaranteeing the legal obligations of the corporation. Inasmuch as the corporation's failure to make loan payments as promised could result only in the loss of the security, the guarantors could not be liable for a money judgment for the corporation's failure to make the payments;

2. whereas the original guaranty agreement of two of the defendants was specifically excepted from the nonrecourse provisions of the corporate loan, their subsequent guaranty agreement, made concurrently with the sale of the security and the loan assumption, was not—hence the second guaranty agreements were not so excepted; and

3. to permit the lending institution to sue the guarantors periodically for missed payments as opposed to resolution by foreclosure is not authorized by the contracts, would result in a multiplicity of actions, and is contrary to public policy.

The case was presented to the district court on stipulations of uncontroverted facts. These stipulations are quite comprehensive—covering all aspects of the pertinent transactions except for the specific negotiations leading to execution of the guaranty agreements replacing the original such agreements. The parties' stipulations as to the cast of characters involved are as follows:

## "Parties and Related Entities

"1. Defendant Hostetler is currently and has been for eight years, Chairman of the Board of Directors of the First Savings Bank of Manhattan, Kansas (formerly First National Bank of Manhattan, Kansas, and hereinafter the 'First Bank of Manhattan'). He has been a member of that Board for 14 years, is an officer of the bank and he or his family owns virtually 100% of the First Bank of Manhattan. Defendant Hostetler obtained a law degree from the University of Kansas, but has never practiced law. He has had limited real estate experience, including experience in agricultural and commercial real estate.

"2. Defendant Lashbrook is currently and has been for approximately three years the President of First National Bank of

Overland Park, Kansas. Prior to that time, he was President of First Bank of Manhattan for nine years, which Bank is a major tenant of The First Bank Center at issue herein and at which Bank defendant Hostetler is Chairman of the Board of Directors.

"3. Defendant Miller is a certified public accountant and a partner in the accounting firm of Miller, Nelson & Company. Miller has been involved in general accounting and financial tax consulting. His accounting clients include real estate brokers, commercial and residential real estate developers and syndicaters and purchasers of real estate. He is and has been personally involved in the real estate development, including the Stillwell Crossing Subdivision development.

"4. Plaintiff Overland Park Savings & Loan Association (hereinafter 'OPS&L') is a federally chartered savings and loan association doing business in the State of Kansas with its principal place of business at 9400 Antioch, Overland Park, Kansas. Plaintiff has a branch office at 7810 151st Street at 69 Highway, Overland Park, Kansas.

"5. Dee-Kay Developers, Inc. is a Kansas corporation principally owned and operated by defendant Miller.

"6. H & L Investments was, at the time of the transactions involved herein a Kansas General Partnership consisting of defendants Hostetler and Lashbrook as general partners. The only asset of the partnership was the shopping complex in Manhattan, Kansas, commonly known as The First Bank Center, which is the subject of this action."

The district court's pertinent findings of fact are as follows:

"3. In 1984, H & L Investments entered into negotiations with OPS&L for a loan which H & L intended to use to develop the First Bank Center.

"4. The land upon which the Center is built was owned in fee simple by the First Bank of Manhattan, a bank owned almost entirely by the defendant Hostetler and his family.

"The First Bank of Manhattan leased the real estate to H & L Investments for the purpose of building a shopping center.

"5. On December 7, 1984, OPS&L loaned 1.2 million dollars to H & L for use in building First Bank Center, a multi-tenant commercial shopping center.

"6. The basic terms of the note were for monthly payments of $14,123.53 from January 1, 1985 to December 1, 1995. On De-

cember 1, 1995, a balloon payment for the balance would be due. Interest was fixed at 13.9% per annum.

"7. The promissory note executed by H & L was secured by a mortgage on the First Bank Center. The mortgage was duly executed by H & L and the First Bank of Manhattan, which held fee simple title to the land.

"8. Three clauses of the promissory note lie at the heart of this controversy: the prepayment clause, the default clause, and the non-recourse clause.

"9. The prepayment clause provides as follows:

'The Maker hereby reserves the privilege to prepay all or any portion of the principal of this Note; the penalty for prepayment shall be the amount by which 13.9% is greater than the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year plus 250 basis points on the date for prepayment multiplied by the number of years remaining to maturity (rounded to nearest .01 years) multiplied by the amount of prepayment; provided, however, that any such prepayment shall be applied first to then accrued but unpaid interest due on this Note, and the balance of any such prepayment shall be applied in reduction of principal thereunder.'

"10. The purpose of such a prepayment clause is to protect the lender from fluctuations in the interest market. Essentially, the banking institution borrows money from other, larger lenders, and then in turn loans it to the ultimate borrowers at interest rates which are slightly higher than the rate being paid by the banking institution. The difference between the two interest rates (i.e., the bank's and the borrower's) is the margin of profit from which the bank pays its operating expenses and makes it[s] profit.

"When a bank loans a large sum of money such as this for a lengthy period of time, it protects itself by a prepayment clause, because the interest rate it is paying to its lender is locked in at the rate at which it borrowed from its lender. Should interest rates fall, the ultimate borrower would naturally refinance at the lower interest rate, and prepay its loan to the bank. In that event, the bank would have to loan the money to new borrowers at the current, lower interest rate, but the bank would still be locked into paying its lender at the higher rate. The prepayment penal-

ties are a formula by which the bank computes, and requires the borrower to pay, the difference between the higher rate at which the borrower contracted and the lower rate existing at the time of prepayment.

"Without such prepayment clauses, banks would be unable to make large, long-term loans during periods of high interest rates.

"11. The default clause, which is set out below, contains no similar penalty protecting OPS&L from fluctuations in the interest market in the event it accelerates the note because of default. It provides:

'In case of default in the payment of any said installments of interest and/or principal due hereunder, or upon default of any of Maker's obligations under the mortgage securing payment of this Note, Lender (or the then existing holder hereof) shall have the right, after ten (10) days of continuing default and after notice giving Maker twenty (20) days to cure such default, to declare the entire unpaid principal balance of this note due and payable at once. Interest at the rate of two and one-half percent (2.5%) per annum shall be due and payable on any sum not paid within ten (10) days from date due.'

"12. The note also contains a non-recourse clause, which is set out below:

'Notwithstanding anything contained in this Note or the Mortgage securing it, neither the Maker, nor any partner thereof, shall have any personal liability to pay the indebtedness evidenced by this Note or to perform any covenant herein or in the mortgage, and the holder of this Note shall look solely to the property securing this Note for the payment of such indebtedness, and no deficiency or money judgment shall be sought or obtained against Maker or any partner of Maker; provided, however, nothing set forth herein shall be construed to limit the personal liability of the guarantor under the Guarantee of even date herewith from the partners of Maker and their spouses to the Lender.'

"13. The note was signed by Lashbrook and Hostetler in their capacity as general partners of H & L Investments.

"14. The mortgage securing the note was also signed by Lashbrook and Hostetler as general partners of H & L Investments and by Hostetler as president of the First National Bank of Manhattan on December 7, 1984. The mortgage document sets

forth a seven-part definition of 'default', which is not relevant to this case, and defines the Mortgagee's right to institute foreclosure proceedings upon default. The mortgage document also contains a non-recourse clause, which does not differ in any significant respect from the one contained in the note. The clause is set forth below:

'Notwithstanding anything contained in this Mortgage or the Note secured hereby, neither the Bank, the Mortgagor, nor any partner thereof shall have any personal liability to pay the indebtedness evidenced by the Note or to perform any covenant therein or in this Mortgage, and the holder of this Mortgage shall look solely to the property encumbered by this Mortgage for the payment of such indebtedness and no deficiency or money judgment shall be sought or obtained against Mortgagor, the Bank or any partner of Mortgagor; provided, however, nothing set forth herein shall be construed to limit the personal liability of the Guarantor under the Guarantee of even date herewith from the partners of Mortgagor and their spouses to Mortgagee.'

"15. The 'guarantee of even date' referred to in the note and mortgage was signed by Charles and Patricia Hostetler and Richard and Patricia Lashbrook. It was signed on December 7, 1984, along with the note and mortgage. The guaranty document was apparently a form used [by] OPS&L, because four separate guaranty documents are involved in this case, and all are identical except for some type[d]-in modifications.

"16. The guaranty signed by Mr. and Mrs. Hostetler and Mr. and Mrs. Lashbrook has the word 'Limited' typed in above the caption 'Guarantee of All Liabilities.' It provides for joint and several liability on the obligation and guarantees 'prompt and unconditional' payment of the liabilities of the borrower (H & L Investments). Typed in near the end of the document is this sentence: 'It is expressly agreed that liability of Guarantor(s) herein is limited to [$500,000.00].'

"17. The guaranty document recites that '[a]ssociation shall have its remedy under this guarantee without being obliged to resort first to any security or to any other remedy or remedies to enforce payment or collection of the obligations hereby guaranteed, and may pursue all or any of its remedies at once or at different times.'

"18. In 1986, H & L Investments negotiated a sale of the shopping center to Dee-Kay Developers, Inc., a corporation owned by defendant David K. Miller. A real estate sale contract was signed by H & L and Dee-Kay on March 13, 1986. The transfer transaction was a complex one, and all parties to this lawsuit made certain concessions in order to effect it. There is some dispute among the parties as to why, and for what consideration, each party took certain actions; but because, in this court's opinion, none of these issues are material to the outcome of this case, they will be set down as uncontroverted. Highly summarized, the transaction occurred as follows:

a) Dee-Kay contracted to buy the First Bank Center for 1.3 million dollars.

b) Payment of the 1.3 million [dollars] was to occur in this manner: Dee-Kay was to pay $1,000 in earnest money; Dee-Kay was to assume the 1.2 million dollar loan at OPS&L; and Dee-Kay was to pay the balance in 'cash equivalent' at closing. The 'cash equivalent' actually was in the form of the transfer by Dee-Kay to Lashbrook a real estate development Dee-Kay owned, known as Stillwell Crossing.

c) OPS&L consented to the assumption of H & L's note by Dee-Kay, and modified the note to permit Dee-Kay to prepay up to $18,000.00 of principal per year without penalty.

d) OPS&L received a fee of .5% of the principal balance due on the H & L note at the time it was transferred to Dee-Kay. The payment of this fee was shared equally by Dee-Kay and H & L.

e) OPS&L cancelled the original $500,000.00 personal guaranties signed by the Hostetlers and the Lashbrooks.

f) Hostetler and Lashbrook (but not their spouses) signed new guaranty documents, in which each of them guaranteed the performance of Dee-Kay on the assumed note to the extent of $200,000 apiece.

g) OPS&L released its mortgage on the Stillwell Crossings property, and Dee-Kay then transferred that property to Lashbrook, free and clear, at the time of closing.

h) OPS&L refinanced for Dee-Kay the loan originally secured by the Stillwell Crossings property, and secured the new note with a second mortgage on Miller's home in Overland Park, Kansas, and a certificate of deposit.

"19. Miller's association with OPS&L predated any of the

above transactions, and on April 17, 1985, he had signed a personal guaranty for all liabilities of Dee-Kay Developers, Inc. to OPS&L. This guaranty had no limitations. The guaranty document he signed in 1985 is identical to the one signed by the Hostetlers and Lashbrooks jointly in December 1984, and the ones signed by Hostetler and Lashbrook individually as part of the 1986 transfer, except that these contained typed-in limitation clauses.

"20. Miller, as president of Dee-Kay Developers, Inc., signed the assumption of H & L's note and mortgage on April 30, 1986. On the same day, a 'Note Modification Agreement' was signed by Miller as president of Dee-Kay, Wilson W. Siemens as president of OPS&L, and the Lashbrooks and the Hostetlers. The modification agreement confirmed all terms and conditions of the December 7, 1984, note, but modified it to the extent that Dee-Kay would be permitted to prepay up to $18,000 per year of the principal of the loan without triggering the prepayment penalty.

"21. On May 2, 1986, H & L assigned its leasehold interest in the First Bank Center to Dee-Kay, and on the same day Lashbrook and Hostetler signed their new guaranties. The new guaranty documents were identical in form to the one they had signed earlier, except for the typed-in limitation clauses. The new guaranty documents differed from the one they had previously signed in several important aspects:

a) They were signed to guarantee the performance of Dee-Kay Development, Inc., on its obligation to OPS&L.

b) Lashbrook and Hostetler signed separate, individual guaranties for $200,000 apiece, instead of a joint and several guaranty for $500,000.

c) Their wives were not required to sign the new guaranties.

"22. The original $500,000 guaranty was cancelled by OPS&L when the new guaranty documents were signed.

"23. Almost immediately after the May 2, 1986, closing on the transaction, Miller learned that the rents actually collected from the shopping center were only about one-half of what he was told to expect when the sale was being negotiated. On May 28, 1986, Miller notified OPS&L that Dee-Kay would default on the June, 1986, payment and all payments thereafter, and suggested to OPS&L that it declare a default and commence foreclosure

proceedings. Miller offered to voluntarily deed the property over to OPS&L in lieu of foreclosure.

"24. Dee-Kay did in fact default on the June, 1986, payment and has not made any of the monthly payments since then.

"25. OPS&L refused Dee-Kay's offer to deed over to it the leasehold improvements, and has refused to declare an acceleration and institute foreclosure proceedings.

"26. Instead, OPS&L has sued Miller, Lashbrook and Hostetler individually on their guaranties."

This action was filed on August 25, 1986, by Overland Park Savings & Loan Association (OPS&L) to recover the unpaid monthly installments from the guarantors. Subsequent to the district court's entry of summary judgment herein, OPS&L filed a foreclosure action which is, apparently, being held in abeyance pending resolution of this appeal.

A guaranty is a contract between two or more persons, founded upon consideration, by which one person promises to answer to another for the debt, default, or miscarriage of a third person, and, in a legal sense, has relation to some other contract or obligation with reference to which it is a collateral undertaking. A contract of guaranty is to be construed, as are other contracts, according to the intention of the parties as determined by a reasonable interpretation of the language used in the light of the attendant circumstances. After the intention of the parties or the scope of the guarantor's undertaking has been determined by application of general rules of construction, the obligation is strictly construed and may not be extended by construction or implication. *Iola State Bank v. Biggs*, 233 Kan. 450, Syl. ¶¶ 1, 2, 662 P.2d 563 (1983); *Trego WaKeeney State Bank v. Maier*, 214 Kan. 169, Syl. ¶¶ 2, 3, 519 P.2d 743 (1974).

In determining "the intention of the parties and the scope of the guarantor's undertaking" attention must be given to the attendant circumstances. Hostetler and Lashbrook were the general partners in H & L Investments. They were the moving parties in attempting to obtain the million dollar plus loan from OPS&L in order to build the shopping center. Obviously, OPS&L was not satisfied to loan the money to H & L without the additional protection of the guaranty agreement from the two individuals and their respective spouses. The parties stipulated this joint and several guaranty of $500,000 was intended to and

did induce OPS&L to make the loan. The reference in the promissory note and mortgage that the "guarantee of even date" identified the instrument, acknowledged its existence, and specifically exempted it from the nonrecourse provision of the note and mortgage.

H & L's partners subsequently entered into negotiations to sell the shopping center to Miller's corporation, Dee-Kay Developers. The OPS&L loan was outstanding. All of the parties and their business entities had an interest in the successful culmination of the proposed sale which hinged upon securing the consent of OPS&L for Dee-Kay's assumption of the loan. Concessions had to be made to gain OPS&L approval. The original guaranty of the partners went to the obligation of the partnership. Inasmuch as the partnership was in the loan on a nonrecourse basis, its only liability was to lose the security—property it was selling to Dee-Kay. OPS&L already had Miller's unlimited guaranty agreement as to Dee-Kay's obligation, but, obviously, it was unwilling to cut all strings between it and the partners individually it had under the note and mortgage. Its acceptance of the loan assumption, something sought by the partners, entailed the cancelling of the original H & L guaranty agreement with its $500,000 joint and several liability, including that of the spouses and substituting the guaranty by the partners of H & L of the obligation of Dee-Kay. It is important to bear in mind that the second guaranty agreement was for the debt of the Dee-Kay Corporation, the purchaser of the shopping center, rather than the debt of the H & L partnership, the seller. The new guaranty agreement, presumably through negotiation, was limited to $200,000 each rather than $500,000 jointly and severally.

We do not believe that the "of even date" language in the note and mortgage created anything in the original guaranty that was not present in the second guaranty. This was a loan assumption—the original loan was not cancelled, it was assumed by Dee-Kay. The note modification agreement of April 30, 1986, allowing for the specified prepayment of interest states:

"WHEREAS, Guarantors have guaranteed payment and performance of said Note and Mortgage by Borrower [Dee-Kay] pursuant to their respective Guaranty Agreements and the terms and conditions thereof; and

"WHEREAS, Borrower and Guarantors requests that said Note be modified and amended to allow future payments and obligations deemed by Borrower as more favorable to them, and Overland Park is willing to modify and amend said Note for the benefit of Borrower and Guarantors."

Miller, Lashbrook, and Hostetler executed this instrument as "Guarantors." Miller also executed it as president of Dee-Kay, "Borrower."

Lashbrook, Hostetler, and Miller contend that their respective guaranties are, for all practical purposes, illusions. That is, inasmuch as OPS&L can look to Dee-Kay only for foreclosure of the real estate with no deficiency judgment, then no liability exists as to the guarantors under any circumstances. If such be the case, why did the partners negotiate the limited dollar amounts of a guaranty agreement that cannot result in any liability to the guarantors? What purpose would the guaranties serve? The parties hereto were experienced and knowledgeable in the field. They obviously intended that the guaranty agreements create rights and impose obligations.

Interpretation of the effect of a guaranty agreement upon a nonrecourse loan has not been before us previously. The case of *Federal Deposit Ins. Corp. v. University Anclote*, 764 F.2d 804 (11th Cir. 1985), had the issue before it and we believe the rationale therein is sound. In *Anclote*, the court stated:

"James C. Petersen appeals from the district court's entry of summary judgment in favor of the Federal Deposit Insurance Corporation (FDIC) in its suit to enforce a guaranty agreement. Finding no error in the district court's construction of the agreement, we affirm.

"On June 10, 1980 University Anclote, Incorporated (Anclote) executed a promissory note in favor of Metropolitan Bank and Trust Company (Bank) in the amount of $1,428,000.00 plus interest at a rate of two per cent over the prime interest rate. The note was secured by a mortgage executed on the same day encumbering specified real property owned by Anclote.

"Both the note and mortgage were essentially non-recourse in nature since the Bank's sole remedy in the event of default was to seek foreclosure of the mortgage. Anclote's note in part provided:

'There shall be no general corporate liability hereunder and nothing contained herein shall obligate the undersigned or its successors or assigns further than to bind its right, title and interest in the property securing this Note and fully described in the Mortgage of even date herewith. In the event of a default hereunder, the sole remedy of the holder hereof shall be foreclosure of the property covered by the aforesaid Mortgage and the holder hereof shall not be entitled to a deficiency judgment and none shall be sought or entered.'

"On June 23, 1980 Petersen executed an 'Unconditional Guaranty with Limits of Liability,' in favor of the Bank. The agreement states:

'[Guarantors] unconditionally guarantee the prompt and full payment to Bank when due of all indebtedness and liabilities of any kind (including

without limitation principal, interest and attorneys' fees) for which Customer [Anclote] is now or may hereafter become liable to Bank in any manner, either primarily or secondarily, absolutely or contingently, directly or indirectly, and whether incurred directly with Bank or acquired by Bank by assignment or otherwise and however evidenced, and any and all renewals or extensions of or substitutes for any of the foregoing indebtedness or liabilities or any part thereof.'

Petersen's liability under the agreement was expressly limited to $600,000.00.

"The Bank subsequently became insolvent and the FDIC was appointed liquidator of the Bank's assets. The FDIC, in its corporate capacity, purchased certain assets from the liquidator, including the note and mortgage involved here. At the time of FDIC's purchase, Anclote had already defaulted in payment of the note.

"The FDIC then brought a foreclosure action against Anclote and sought recovery on the guaranty from Petersen. The basic issues were decided on the parties' motions for summary judgment. The district court entered judgment of foreclosure against Anclote and a judgment against Petersen to the extent of his liability under the guaranty, $600,000.00.

"Petersen contends that because the primary debtor cannot be held liable for the amount of debt reflected in the note, neither can he, as guarantor, be held liable for this sum. He asserts that, as a collateral undertaking, the extent of his guaranty can only be determined with reference to Anclote's obligations after default. He argues that since Anclote's liability to FDIC was wholly satisfied by the foreclosure decree, there is no longer any underlying debt left for him to pay. Petersen contends that because the agreement does not expressly provide for greater liability on the part of the guarantor, he cannot be held liable beyond the extent of Anclote's liability.

"We have no trouble with Petersen's recitation of the general rules governing contracts of guaranty. If a guaranty is free from ambiguity, it is strictly construed in favor of the guarantor. *Scott v. City of Tampa*, 158 Fla. 712, 30 So.2d 300, 302, *cert. denied*, 332 U.S. 790, 68 S.Ct. 99, 92 L.Ed. 372 (1947). If ambiguous, it is construed against the drafter—here, the Bank and its assignee, the FDIC. *See Miami Nat'l Bank v. Fink*, 174 So.2d 38, 40 (Fla.3d DCA), *cert. denied*, 180 So.2d 658 (Fla. 1965). A guaranty is a collateral promise to answer for the debt or obligation of another. *Nicolaysen v. Flato*, 204 So.2d 547, 549 (Fla. 4th DCA 1967), *cert. denied*, 212 So.2d 867 (Fla. 1968). The extent of the guarantor's liability depends upon the language of the guaranty itself and is usually equal to that of the principal debtor. 38 Am.Jur.2d *Guaranty* § 74 (1968). '[A] guarantor is liable only in the event and to the extent that his principal is liable.' *Id.* at § 77. Finally, if the principal's obligation has been paid or satisfied, the guarantor's obligation is terminated. *Id.* at § 78.

"The difficulty in this case arises, however, in applying these rules to the documents at issue. The crux of the controversy is the debt or obligation Petersen undertook to guarantee. Petersen contends that a guarantor's legal liability is that of the principal debtor's after default. Here, he alleges there is no guarantor liability since the FDIC may not pursue the principal debtor beyond foreclosure of the property. The FDIC, on the other hand, contends that the language of the guaranty is unconditional and refers to all of Anclote's debt, whether recourse or non-recourse.

"After careful consideration, we agree with the FDIC's construction of the extent of Petersen's liability under the guaranty. The guaranty agreement itself reflects that Petersen guaranteed all indebtedness and liabilities of any kind for which Anclote *was or was to become liable.* Despite the fact that the note prohibited any deficiency judgment and provided that the holder's sole remedy was to be foreclosure against the property, the note and mortgage also provided that upon default the holder could declare the entire balance due and payable and could enforce the collection of all sums due.

"We agree with the district court that the 'logical interpretation of these provisions concerning liability, acceleration and remedies is that while the Plaintiffs may accelerate and obtain judgment against Anclote for the total balance due under the note, that judgment cannot be satisfied from any Anclote assets other than the mortgaged property.' However, Anclote's 'indebtedness' is the total sum reflected in the note, plus interest and other costs. As Petersen unconditionally guaranteed to pay this amount if Anclote defaulted, he may be called upon to satisfy the debt up to the express limit of his guaranty.

"As for Petersen's claim that greater liability is being imposed upon him than that of the principal debtor, such is not precisely the case. Petersen and Anclote are both liable for the amount of the note, plus interest and costs. Merely because Anclote cannot be held liable for a deficiency judgment does not mean that Anclote did not incur an indebtedness when it signed the note. Similarly, Petersen can be held liable for his separate and independent promise to pay the full amount of Anclote's obligation.

"Even assuming that greater liability is being imposed, such was created by the contract itself. Petersen guaranteed to pay all indebtedness 'of any kind' for which Anclote was liable 'in any manner, either primarily or secondarily, absolutely or contingently, directly or indirectly.' It further provided that:

> 'No extension of time or other indulgence granted by Bank to Customer or Guarantors, or any of them, will release or affect the obligations of Guarantors and no omission or delay on Bank's part in exercising any right hereunder or in taking any action to collect or enforce payment of any obligation guaranteed hereby will be a waiver of any such right or release or affect the obligations of Guarantors hereunder.'

The language, in conjunction with the fact that the guaranty was undertaken in connection with a non-recourse debt, acted to expressly create greater liability on the part of the guarantor. *See Victory Highway Village, Inc. v. Weaver,* 480 F. Supp. 71, 75-76 (D. Minn. 1979) (where somewhat similar language in a guaranty agreement was held to create greater liability on the part of the guarantor in circumstances where principal debtor could not be held liable for a deficiency judgment) . . . .

"A contract of guaranty may provide for greater liability than that of the principal debtor. 38 C.J.S. *Guaranty* § 43 (1943). Petersen's unconditional guaranty of the non-recourse obligation is precisely such an undertaking. Any other construction of the contract would be elevating form over substance, and, as the district court noted, would 'declare that the parties originally involved in the negotiation of the guaranty engaged in the drafting of an elaborate agreement which was, from its inception, meaningless and without value.'

"In sum, the terms of the guaranty are clear and unambiguous. Even construed strictly, Petersen's guaranty unconditionally promises to pay Anclote's debt upon default and the parties clearly intended that the guaranty cover the note at issue here. There being no material issue of fact in dispute, summary judgment is AFFIRMED." 764 F.2d at 804-07.

To be sure, *Anclote* involved a deficiency judgment following foreclosure. In the case before us, OPS&L is seeking past due payments on the loan. We do not believe this distinction is significant, however. The guaranty agreements herein grant OPS&L the right to proceed directly against the guarantors "without being obliged to resort first to any security or to any other remedy or remedies to enforce payment or collection of the obligations hereby guaranteed." This is what OPS&L is attempting to do in this case. If the security itself is the only protection of OPS&L, then there are no remedies other than foreclosure and the quoted language is only illusory.

Further, unlike the district court, we do not believe multiple actions for unpaid rent are so contrary to the public policy of deciding all disputes in one lawsuit so as to invalidate contractual rights affording alternate or successive remedies. Judgments against Lashbrook and Hostetler cannot exceed their $200,000 individual liability. Miller's liability is unlimited, but his corporation is the borrower.

We conclude the district court erred in holding that the action herein violated the contracts and was contrary to the public policy of the State.

The summary judgments rendered herein are reversed and the case is remanded for further proceedings consistent with this opinion.