HILL PETROLEUM
COMPANY, Plaintiff,

v.

PATHMARK INTERNATIONAL, INC.,
Richard J. Boushka, Joan Boushka,
Thomas M. Dower and Sue M. Dower,
Defendants.

No. 89–1256–C.

United States District Court,
D. Kansas.

March 6, 1991.

Clifford L. Malone, Adams, Jones, Robinson and Malone, Wichita, Kan., for plaintiff.

Michael C. Gillespie, Foulston & Siefkin, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

CROW, District Judge.

Hill Petroleum Company (HPC) brings this diversity of citizenship action to recover money for petroleum products sold and delivered to defendant Pathmark International, Inc. The other named defendants are individuals who executed guarantees in favor of HPC. This matter comes before the court upon HPC's motion for summary judgment against Pathmark and the guarantors. The court, having considered the parties' briefs and the applicable law, is now prepared to rule.

### Facts

Most of the facts of this case are undisputed. Hill Petroleum Company is incorporated under the laws of the state of Texas with its principal place of business in Greenwich, Connecticut. HPC sells petroleum products. Pathmark is incorporated under the laws of the state of Tennessee, with its principal place of business in Memphis, Tennessee. The defendants Richard J. Boushka, Joan Boushka, Thomas M. Dower, and Sue M. Dower are residents of the state of Kansas. Richard J. Boushka and Thomas M. Dower are principal owners of Pathmark. Thomas Dower became President and managing officer of Pathmark in August, 1987.

Apparently, HPC and Pathmark enjoyed an ongoing business relationship for several years. Pathmark purchased petroleum products from HPC for resale. After HPC delivered products to Pathmark, HPC would issue its invoice, often by fax. Payment was due in full twelve days later.

As security for Pathmark's payment, defendants Richard J. Boushka, Joan Boushka, Thomas M. Dower and Sue M. Dower executed guaranties in favor of HPC. Each of the guaranties had identical language. In pertinent part the guaranties provide:

In consideration of the extension of credit and/or financial accommodations to Pathmark International, Inc. (hereinafter referred to as "Customer") by Hill Petroleum, Inc. (hereinafter referred to as "Creditor") in connection with the sale by Creditor to Customer of, or agreement to sell, from time to time, oil products, petrochemicals and/or other goods, the undersigned, jointly and severally and *in solido* with Customer and any and all sureties and guarantors, irrevocably and unconditionally guarantee to Creditor upon demand the full, prompt and complete payment, without set-off, counterclaim or deduction, of all sums, without limit as to amount, which now are, or may hereafter become due and payable to Creditor, as a result of the failure of Customer to perform any obligations or pay any indebtedness due Creditor by Customer including without limitation, all damages, losses, costs, and expenses incurred by Creditor together with reasonable attorney's fees which are herein fixed at 25% of the balance due.

The undersigned waive notice of acceptance hereof, orders, sales and deliveries to Customer and the amounts and terms thereof, all defaults or disputes with the Customer, and the settlement or adjustment of such defaults or disputes. The undersigned, without affecting their liability hereunder in any respect, consent to and waive notice of all changes of terms, the withdrawal or extension of credit or time to pay, the release of the whole or any part of the indebtedness, the settlement or compromise of differences, the acceptance or release of security, the acceptance of notes, trade acceptances, or any other form of obligation for Customer's indebtedness, and the demand, protest, and notice of protest of such instruments or their endorsements. The undersigned agree that sureties or other guarantors may at any time be released in whole or in part from their obligations without consent of or notice to the undersigned who shall remain bound *in solido* for the entire amount of this guaranty. The undersigned also consent to and waive all notice and pleas of discussion and division, and notice of any arrangements or settlements made in or out of court in the event of receivership liquidation, readjustment, bankrupt-

724

cy, reorganization, arrangement, or assignment for the benefit of creditors of Customer, and anything whatsoever, whether or not herein specified, which may be done or waived by or between Creditor and Customer. In the event of the occurrence of any of the foregoing, Creditor will be deemed to have reserved the right to enforce this Guarantee for the full unpaid balance of all indebtedness of Customer to Creditor without credit or reduction of such indebtedness with respect to any amount, share, quota or portion not actually collected by Creditor...

The Dowers executed their guaranty on April 18, 1986. The Boushkas executed their guaranty on April 23, 1986.

On July 20, 1988, approximately two years later, HPC received more security in the form of an "Irrevocable Standby Letter of Credit." The standby credit amount was initially $600,000. The standby letter of credit was issued by MBank of Houston and confirmed by Citibank, N.A., New York, New York. The standby letter of credit, which was amended from time to time, was scheduled to expire on February 15, 1989.

During January and February of 1989, HPC sold and delivered petroleum products to Pathmark totaling $298,700.07. Between February 6, 1989, and February 8, 1989, Pathmark issued three checks to HPC totalling $164,715.52 in partial payment of that debt. The checks were drawn on MBank of Houston.

On or about February 9, 1989, Kenneth Tallevi, a credit analyst for HPC, spoke to Tricia Harrington at Pathmark about Pathmark's account. Harrington is an assistant to Dower. Harrington told Tallevi that the three checks had been mailed, leaving a balance of $133,984.55. Tallevi informed Harrington that the remaining balance would have to be paid on or before February 13, 1989, because the standby letter of credit was scheduled to expire on February 15, 1989.

On Monday, February 13, 1989, Tallevi was informed by HPC's accounts receivable department, via electronic transmission from First Chicago, that the three Pathmark checks totalling $164,715.52 had been received by HPC's First Chicago lock box account in Dallas and credited to HPC's account.

At this point, the parties' versions of the facts differ.[1] According to HPC, later on Monday, February 13, 1989, Dower called Tallevi and told him that Pathmark was unable to wire the remaining balance owed to HPC. Dower informed HPC that it should draw against the standby letter of credit. On February 15, 1989, HPC, not knowing that the checks totalling $164,715.52 would bounce, prepared the documentation required to draw $133,984.55 (the apparent balance of Pathmark's account) on the letter of credit. Therefore, on February 15, 1989, HPC believed that it had received payment for the entire $298,700.07 debt: $164,715.52 from the three Pathmark checks and $133,984.55 drafted from the letter of credit.

According to the defendants, on February 13, 1989, Dower advised Tallevi that MBank had dishonored Pathmark checks,[2] possibly including the three checks issued to HPC in partial payment of the debt. Dower directed Tallevi to draw against the standby letter of credit, specifically stating "draft the bastards." Dower intended his direction to draw against the standby letter of credit to serve as a direction to Hill to draft against the letter of credit for the *full* amount of Pathmark's debt to Hill. The defendants contend that this direction constituted a full tender of Pathmark's obligation, and that HPC, by not drafting the letter of credit against the full amount of

1. According to the defendants, these controverted facts prevent the entry of summary judgment.

2. Pathmark maintained a checking account at MBank of Houston. In February 1989, MBank "over-accrued" or "over-escrowed" funds it was "escrowing" from the Pathmark checking account; those funds were earmarked for payment of various excise taxes. As a result of this, MBank dishonored checks written on Pathmark's general account. The three checks issued to HPC were among the checks that were dishonored.

Pathmark's debt, rejected full tender and thereby released the guarantors of their liability.

On Friday, February 14, 1989, HPC was informed for the first time by its bank, First Chicago, that the three checks from Pathmark totalling $164,715.52 had been returned for insufficient funds. Despite HPC's repeated requests for payment, the balance of Pathmark's account remains unpaid.

On May 16, 1989, HPC brought this suit against Pathmark and the guarantors to collect the unpaid balance of $164,715.52 plus statutory interest from February 8, 1989.

### Summary Judgment

Summary judgment is appropriate when the movant can demonstrate that there is no genuine issue of material fact and is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R. Civ.P. 1). *See* Fed.R.Civ.P. 56(c).

HPC contends that the guarantors are jointly and severally liable for any amounts Pathmark failed to pay. HPC contends that, even assuming that Pathmark directed it to draft against the letter of credit in the full amount of the debt owed, the guaranties jointly and severally obligated the defendants to pay any amounts Pathmark owes. Pathmark responds that the guaranties are not "unconditional" and that the guaranties are ambiguous because they do not mention the "tender" defense, and thus are not dispositive, requiring submission of the issue to the trier of fact.

The Supreme Court of Kansas recently considered the definition and proper means of interpreting a guaranty.

A guaranty is a contract between two or more persons, founded upon considera-tion, by which one person promises to answer to another for the debt, default or miscarriage of a third person, and, in a legal sense, has relation to some other contract or obligation with reference to which it is a collateral undertaking. A contract of guaranty is to be construed, as are other contracts, according to the intention of the parties as determined by a reasonable interpretation of the language used in the light of the attendant circumstances. After the intention of the parties has been determined by application of general rules of construction, the obligation is strictly construed and may not be extended by construction or implication. (Citations omitted).

*Overland Park Savings & Loan Ass'n v. Miller,* 243 Kan. 730, 738, 763 P.2d 1092 (1988). "A guarantor is not liable except under the terms of the guaranty. No cause of action on a guaranty arises until the debtor defaults." *Kee v. Lofton,* 12 Kan.App.2d 155, Syl. ¶ 1, 737 P.2d 55 (1987).

"Contracts of guaranty are of two types: conditional and unconditional. The first type requires the guarantor to first proceed against the principal obligor before attempting to collect from the guarantor, while the second does not." *Kansas State Bank & Trust Co. v. DeLorean,* 7 Kan.App.2d 246, Syl. ¶ 7, 640 P.2d 343, *rev. denied* 231 Kan. 800 (1982). The general rule is that the extinguishment, release or discharge of the principal's contract relieves the guarantor of his or her obligation to pay. *See Iola State Bank v. Biggs,* 233 Kan. 450, 456, 662 P.2d 563 (1983). However, the general rule is not without limitation. A guarantor may waive a debtor's defenses against a creditor. *See Aetna Life Ins. Co. v. Anderson,* 848 F.2d 104, 107 (8th Cir.1988) (applying Iowa law); *Continental Ill. National Bank & Trust Co. v. Stanley,* 606 F.Supp. 558, 562–563 (N.D.Ill.1985). A contract of guaranty may provide for greater liability than that of the principal debtor. *Miller,* 243 Kan. at 742, 763 P.2d 1092.

█ If a contract is unambiguous, the contract should be enforced according to its terms. Language in a contract is ambiguous if the words in the contract are subject to two or more possible meanings. *NEA–Goodland v. U.S.D. No. 352*, 13 Kan. App.2d 558, 562, 775 P.2d 675 (1989). The court need not look beyond the four corners of the contract where the parties have reduced their agreement to written form and the document is unambiguous on its face. *Koch v. Koch*, 903 F.2d 1333 (10th Cir.1990). "Reasonable rather than unreasonable interpretations of contracts are favored and results which vitiate the purpose or reduce the terms of a contract to an absurdity should be avoided." *DeLorean*, 7 Kan.App.2d 246, Syl. ¶ 4, 640 P.2d 343. The tenth circuit has recognized "the universal rule that courts will not make contracts under the guise of judicial interpretation, but must enforce them in accordance with their clear and unambiguous language." *Phico Ins. Co. v. Providers Ins. Co.*, 888 F.2d 663, 667 (10th Cir.1989).

█ The court concludes that the guaranty is unambiguous and that the defendants are jointly and severally liable for any amounts Pathmark currently owes HPC. By the terms of the guaranties, the guarantors

> irrevocably and unconditionally guarantee to Creditor upon demand the full, prompt and complete payment, without set-off, counterclaim or deduction, of all sums, without limit as to amount, which now are, or may hereafter become due and payable to Creditor, as a result of the failure of customer to perform any obligations or pay any indebtedness due Creditor by Customer ...

The guaranties also state:

> The undersigned agree that sureties or other guarantors may at any time be released in whole or in part from their obligations without consent of or notice to the undersigned who shall remain bound *in solido* for the entire amount of this guaranty. The undersigned also consent to and waive all notice and pleas of discussion and division, and notice of any arrangements or settlements made

in or out of court in the event of receivership, liquidation, readjustment, bankruptcy, reorganization, arrangement, or assignment for the benefit of creditors of Customer, and anything whatsoever, whether or not herein specified, which may be done or waived by or between Creditor and Customer...

The court can find no ambiguity in the guaranty and will enforce it by its own terms. Pathmark has not paid HPC for goods it has received; the guarantors are liable to HPC for that amount.

The defendants' contention that the guaranties are ambiguous because they are silent as to the "tender" defense, is incorrect. The guaranties are unconditional and by the terms of the guaranty, the guarantors are obligated to pay HPC any amounts Pathmark owes to HPC. The defendants' suggestion that the "unconditional" guaranty must also include a laundry list of defenses which are waived by the guarantors in order to waive such defenses is untenable.

The business transactions in this case involved large amounts of money and concerned fairly sophisticated business dealings. The nature of the transactions simply compelled close scrutiny of the guaranties by the guarantors. The guarantors have not demonstrated any reason to the court why it should not enforce the guaranties by their own terms. Nor is it the court's role to judge the wisdom of an unconditional guaranty. "The policy of law in general is to permit mentally competent parties to arrange their own contracts and fashion their own remedies where no fraud or overreaching is practiced. Contracts freely arrived at and fairly made are favorites of the law." *Kansas City Structural Steel Co. v. L.G. Barcus & Sons, Inc.*, 217 Kan. 88, 95, 535 P.2d 419 (1975).

█ Generally, the refusal of the creditor to accept an unconditional proper legal tender made by the principal results in a complete release of the guarantor. *See Fidelity & Deposit Co. v. Fidelity Finance Co.*, 111 S.W.2d 809 (Tex.Civ.App.1937); 38

C.J.S. *Guaranty* § 77c. at 1247 (1943).[3] However, the general rule of law is subject to the other express terms of the guaranty. None of the cases cited by the defendants, nor any found by the court, involved releasing the guarantors upon rejection of tender when the guaranty contained language similar to the guaranties in this case. The court concludes that under the terms of these guaranties, the defendants, in essence, waived the "tender" defense.

In this same vein, the court notes that the standby letter of credit was executed over two years after the guarantors signed the guaranty. No argument can be made that the guarantors relied on the existence of the standby letter of credit in executing the guaranties.

The guarantors agreed to pay HPC for any amounts owed by Pathmark. It is undisputed that Pathmark has not paid HPC for $164,715.52 worth of petroleum products. The defendants are obligated to pay Pathmark's $164,715.52 debt. The court concludes that under the terms of the guaranties the defendants are jointly and severally liable to HPC for the amount Pathmark owed.

■ In the alternative and irrespective of the unconditional guaranties, the court concludes that even if Dower did direct HPC to draft the letter of credit for the full amount owed, this direction did not constitute a "tender" sufficient to extinguish the defendants' liability. The defendants' contention that directing HPC to draft the documents necessary to draw against the letter of credit constituted "tender" so as to cut off the liability of the guarantors is unsupported by any case directly on point, nor is the court satisfied that this argument is sound.

■ In general, a letter of credit is a "written instrument by which the writer requests or authorizes a person to whom it is addressed to pay money or deliver goods to a third person, and which evidences an agreement whereby the writer assumes responsibility for the payment to the addressee of the amount of the debt." *Failing Co. v. Cardwell Investment Co.*, 190 Kan. 509, 516, 376 P.2d 892 (1962). A much more comprehensive explanation of letters of credit and their use and function is found in I J. White & R. Summers, *Uniform Commercial Code* § 19–1 through 19–11 (3rd ed. 1988).

In the case at bar, HPC was the beneficiary of the standby letter of credit. White and Summers describe a standby letter of credit:

> The commercial letter of credit acts as a payment medium for goods sold. By contrast, the standby letter of credit acts as a "back up" against customer default on obligations of all kinds, both monetary and non-monetary. Standby letters function somewhat like guaranties, for it is customer's failing that prompts beneficiary's call on the letter. Yet the standby letter differs from the guaranty in important ways. Even so, this back-up feature—in theory more easily and more cheaply available from bankers than from traditional sureties—explains the limitless versatility of standby letters and their growth during recent times. Misconceptions about this feature may also explain the mass of litigation over them.

*Id.*, § 19–1, p. 4.

The court is unpersuaded that directing HPC to draw against the standby letter of credit was a "tender" so as to cut off the liability of the defendants. "Tender is an unconditional offer to perform a condition or obligation. The party making tender must have the ability for immediate performance. The tender must be absolute and unconditional to be effectual." *Carpenter v. Riley*, 234 Kan. 758, 761, 675 P.2d 900 (1984); *see also Fidelity & Deposit Co.*, 111 S.W.2d at 813 (tender must be absolute and unconditional to release the guarantor). By contrast, a letter of credit is typically not unconditional. I J. White & R. Summers, *Uniform Commercial Code*

---

**3.** Later in this opinion, the court concludes that HPC did not wrongfully refuse "proper legal tender."

§ 19–3 at 11. "Nor is a letter of credit a negotiable instrument." *Id.* The transaction establishing the letter of credit is separate and independent from the underlying business transaction between the beneficiary and the issuer's customer. *American Coleman Co. v. Intrawest Bank of Southglenn,* 887 F.2d 1382 (10th Cir.1989).

In the case at bar, the standby letters of credit were not "unconditional." While the standby letter of credit was irrevocable, it provided further:

> THIS CREDIT IS AVAILABLE BY BENEFICIARY'S *SIGHT DRAFTS DRAWN ON CITIBANK, N.A. NEW YORK WHEN* ACCOMPANIED BY THE ORIGINAL OF THIS CREDIT AND BY THE FOLLOWING DOCUMENTS:
>
> 1. A STATEMENT PURPORTEDLY SIGNED BY AN OFFICER OF HILL PETROLEUM COMPANY STATING THE BELOW REFERENCED INVOICE WAS PRESENTED TO PATHMARK INTERNATIONAL INC. AND WAS NOT PAID UNDER INVOICE PAYMENT TERMS AND REMAINS UNPAID AT THE TIME OF DRAWING.
> 2. COPY OF COMMERCIAL INVOICE.

Moreover, only HPC could consummate the transaction; necessarily, Pathmark could not provide immediate performance as is required for proper tender.

The court is also concerned that considering Pathmark's direction to draft against the letter of credit would undermine utility of letters of credit. Should a creditor run the risk of discharging the guarantors each time it takes a draw against a standby letter of credit? This court does not believe this is an acceptable result under modern commercial practices.

The defendants contend that HPC has waived its objections to whether tender was made because it failed to make a contemporaneous objection to the $133,984.55 draw against the standby letter of credit. The defendants state the general rule that objections to the medium of tender are waived if not made at the time tender is made. *See Gardner v. Spurlock,* 184 Kan. 765, 339 P.2d 65 (1959). That case and others stating the general rule are distinguishable from the case at bar; those cases typically involved payment in the form of a check rather than cash. In the case at bar, the court has concluded that Pathmark's request of HPC to draft against the standby letter of credit was not a "tender."

In sum the court concludes that Pathmark's direction of HPC to draw against the full amount of its indebtedness did not constitute a tender of payment so as to cut off the liability of the defendants. While the defendants' argument is novel, accepting it would require the court to stretch the concept of "tender" beyond its breaking point. In this case HPC acted in a commercially reasonable fashion and by no act or omission did it release the guarantors from their contractual obligations.

IT IS THEREFORE ORDERED that HPC's motion for summary judgment is granted and judgment is entered in favor of HPC and against all of the defendants in the amount of $164,715.52 plus the statutory rate of interest from February 8, 1989. As provided in the guaranties, the liability of the guarantors is joint and several.