(898 P.2d 1145)
No. 71,829

TMG LIFE INSURANCE COMPANY, Successor in Interest by Virtue of Merger of ASSOCIATION LIFE INSURANCE COMPANY, INC., and WESTERN STATES LIFE INSURANCE COMPANY, *Appellant/ Cross-Appellee,* v. BARNEY ASHNER, REX A. BERTRAM, JAMES H. FERRICK, MIKE HALES, GEORGE H. KISTER, KAREN M. KISTER, MALCOLM W. MARTIN, and CHRISTIAN B. PEPER, JR., *Appellees/Cross-Appellants.*

Opinion filed June 23, 1995.

*Anne Lamborn Baker,* of Wright, Henson, Somers, Sebelius, Clark, & Baker, of Topeka, for appellant/cross-appellee.

*Benjamin F. Mann, Price A. Sloan,* and *Tessa K. Jacob,* of Blackwell Sanders Matheny Weary & Lombardi, L.C., of Kansas City, Missouri, for appellee/cross-appellants.

Before LARSON, P.J., ROYSE, J., and NELSON E. TOBUREN, District Judge, assigned.

LARSON, J.: This is an appeal from TMG Life Insurance Company's (TMG or lender) attempt to enforce the terms of a personal guaranty against the individuals who are the general partners of Royal Crest Associates (RCA), subsequent to RCA's bankruptcy and the transfer to TMG of the collateral securing TMG's loan to RCA.

Involved in this appeal are the provisions of notes, guaranties, mortgage and security agreements, and assignments of lease and rents, plus actions by and in the United States Bankruptcy Court for the District of Kansas. We must of necessity set forth the facts in considerable detail so the background and basis for each legal argument can be established.

TMG is the successor to two life insurance companies who in 1989 loaned RCA, a Missouri partnership, a total of $3,525,000 to acquire the Kreekside Manor apartment complex in Kansas City, Kansas. The apartment complex was given as security for the borrowings which were structured as nonrecourse loans secured by a mortgage and security agreement plus an assignment of leases and rents. The eight general partners of RCA, Barney Ashner, Rex A. Bertram, James H. Ferrick, Mike Hales, George H. Kister, Karen Moculeski Kister, Malcolm W. Martin, and Christian B. Peper, Jr., (Guarantors), in their individual capacities, executed a guaranty "limited to an amount equal to one-third of the amount of the loan from time to time outstanding," which gives rise to the principal issue of this appeal.

RCA defaulted in early 1991 on its obligations to the lender on the notes. The lender notified RCA on May 31, 1991, of its intent to accelerate RCA's obligations on the unpaid principal balance of $3,471,477.97, which with interest, default charges, late charges, and reinvestment premium totaled approximately $4,009,150 at the time of the default.

On June 5, 1991, RCA filed for relief under Chapter 11 of the bankruptcy code. The lender did not make demand to collect the apartment rents and agreed in the bankruptcy case to allow RCA to use the rents for maintenance and operation of the Kreekside Manor Apartments. In December 1991, RCA proposed a Plan of Reorganization which essentially called for RCA to deed the apartment complex to TMG in complete payment of the notes.

TMG sued the guarantors in their individual capacities under the limited guaranties in February 1992. TMG amended its petition to seek recovery of post-default rents in November 1992.

TMG objected to RCA's proposed Plan of Reorganization and claimed the amounts owed to it were secured not only by the apartment complex, but also by the rents received by RCA after acceleration of the loan. Because of TMG's objection, an issue before the bankruptcy court was whether the value of the apartment complex was sufficient to satisfy both of the lender's claims. After the confirmation hearing, where evidence was presented as to the value of the complex, the lender did not press its claim for the rents received by RCA during the pendency of the bankruptcy. Consequently, the bankruptcy court confirmed RCA's plan and held the lender was not impaired.

As the result of the confirmed plan, in June 1992, Kreekside Manor was conveyed to TMG. TMG sold the complex in November 1993 for $1,325,000 and received net sale proceeds of $1,170,139.39.

The trial court in this case entered summary judgment in October 1993 and determined that the guarantors were responsible under the terms of the guarantee for one-third of the outstanding indebtedness at the time of the demand and acceleration of the indebtedness on May 31, 1991, plus the amount of rents collected by RCA during the bankruptcy. This was not an appealable final

judgment and was not referred to, mentioned, or discussed in the ruling made in the subsequent trial.

This case was tried to the court in a one-day trial in March 1994. The issues to be decided, according to the trial court, were (1) the value of the Kreekside property, (2) its implication in the enforcement of the guarantee, (3) whether the prepayment premium is applicable, and (4) the disposition of the rents collected during the course of this litigation.

The trial court in its memorandum decision of April 14, 1994, did not reach the issue of the validity of the prepayment premium, found the guarantor's obligation was satisfied by the proceeds from the sale of the Kreekside property, and determined that TMG was entitled to recover from the guarantors the accumulated net rents of $300,000. The decision specifically stated:

"According to the Defendants' theory of the case, the actual determination of the value of the complex is irrelevant as long as the Court determines that it was worth at least $3.6 million dollars. Under that theory the amount received for the sale of the real estate, $1,170,000.00 exceeds one-third of the $3,471,487.00 which was the amount of the outstanding principal at the date of the default and therefore the obligation is satisfied. Since the Plaintiff received slightly more than one-third of the outstanding balance, which was computed as $3,471,478.00 by the Plaintiff, and $3,578,946.00 by the Defendant, the obligation of the guarantors is satisfied. Although the Court agrees with the Defendants that the above analysis makes the valuation of the property somewhat moot, the Court should address this issue as both parties and counsel have spent a great deal of time and effort on establishing the value of the Kreekside property. It appears to the Court that the evaluation of the Appraiser, David Craig, is tainted by the inclusion of a $1 million liability for deferred maintenance. The $1 million was a hotly contested issue and the Court tends to believe, as the Defendants, that this is a speculative and conjectural amount and makes the appraisal somewhat suspect. It should be noted that when there was an opportunity to spend the recommended $1 million, the Plaintiff chose not to do so, which under its theory would have brought the property into a better income-producing position. Again the Court is in substantial agreement with the Defendants' analysis herein which makes it unnecessary to reach the issue of whether the prepayment premium is a legitimate charge or a penalty. The Court therefore finds that the guarantor's obligation under the guarantee contained in the note, has been fully satisfied by the realization of the sale proceeds from the Kreekside property.

"In regards to the rents, the Court is of the judgment that the gross rents should not be paid over to the Plaintiff. The Plaintiff was the beneficiary of the partnership operating the real estate with the consent of all concerned. It was certainly

necessary to utilize the rents to pay the operating expenses of the property during the time it was being operated by the partnership and therefore no additional rents are legitimately due to the Plaintiff. The accumulated net rents of $300,000.00 should be paid over to the Plaintiff as it was the owner of the property and legally entitled to any rents remaining over payment of operating expenses.

"Judgment is therefore rendered in favor of the Defendants on the issue of the guarantee and in favor of the Plaintiff on the issue of collection of remaining rents."

From this judgment, TMG appealed, contending: (1) the trial court erred in ruling the guarantors' liability was satisfied by its receipt of proceeds from its sale of the apartment complex because it erroneously construed the guaranty, and the sale proceeds should be applied to the debt of RCA but not to the limits of liability; (2) the trial court erred when determining the amount of the guarantors' liability by (a) not including the prepayment premium in the amount due by RCA on the date of acceleration, (b) not including accrued interest in the amount due on the date of acceleration, and (c) not including the accrued late fees in the amount due on the date of acceleration; and (3) the trial court erred in finding the valuation of the apartment complex was moot because determination of the value of the complex is an essential element necessary to determine the guarantors' remaining liability to TMG.

The guarantors cross-appealed, contending the trial court erred in finding them liable for post-default rents collected in the amount of $300,000 because (1) TMG failed to make demand as required under the express terms of the notes, (2) TMG waived any right it had to such rents, and (3) based upon the bankruptcy judgment, recovery of the rents is precluded under the doctrine of res judicata.

*Did the trial court err in holding that the guarantors' liability was satisfied by the proceeds of the sale of the apartment complex?*

Although the trial court in its ruling did not refer to its earlier interlocutory summary judgment decision where it held the guarantors were liable for one-third of the amount outstanding on the loan as of the date of default, it appears to have concluded at trial that since the apartment complex was worth more than this amount, the conveyance of the complex to the lender extinguished the guarantors' liability.

The interrelation of the guaranty and the notes establishes the nature of the guarantors' liability and the amounts which can be found to be due under the guaranty, but we must first resolve the limitation of the guaranty, which in relevant part provides:

"WHEREAS, the Guarantors are the general partners of the Borrower, and;

"WHEREAS, as an inducement to the Lender to make the Loan, the Lender has required that the Guarantors agree to guarantee the payment of the payments due or to become due from the Borrower to the Lender and the performance of all other obligations of the Borrower under the Notes, Mortgage and Security Documents and to execute and deliver this Guarantee;

"NOW, THEREFORE, in consideration of the foregoing and in consideration of the making of the Loan by the Lender to the Borrower, and intending to be legally bound hereby, Guarantor hereby agrees as follows:

"1. Guarantee. Guarantors, jointly and severally, unconditionally guarantee and promise to pay to, or to the order of, the Lender, on demand, in lawful money of the United States of America, the obligations of the Borrower under the Notes, Mortgage and Security Documents, and Guarantors unconditionally guarantee performance and discharge of each and every obligation, covenant and agreement of Borrower contained in the Notes, Mortgage and Security Documents.

*"The liability and obligation of Guarantors hereunder shall be limited to an amount equal to one-third of the amount of the Loan from time to time outstanding.* The limitation of the preceding sentence shall not apply to the events and conditions under which the liability of Borrower and any General Partner of Borrower, continues without limitation under the Notes. [Emphasis added.]

"2. Nature of the Guarantee. This is a Guarantee of payment and not of collection. The liability of Guarantors hereunder is independent of the Notes and a separate action or separate actions may be brought and prosecuted against one or more of the Guarantors, whether any action is brought or prosecuted against the Borrower or any other Guarantor or whether the Borrower is joined in any such action or actions. . . .

. . . .

"4. Waivers. Each Guarantor waives the right to require the Lender to proceed against Borrower . . . to proceed against or exhaust any security held from the Borrower or any other person, or to pursue any other remedy in the Lender's power whatsoever, and each Guarantor waives the right to have the property of the Borrower first applied to the discharge of the Notes."

The determination of the liability of the guarantors involves the construction of a written contract, which is a matter of law. "Regardless of the construction of the written contract made by the trial court, on appeal a contract may be construed and its legal effect determined by the appellate court." *Patrons Mut. Ins. Ass'n*

*v. Harmon*, 240 Kan. 707, 713, 732 P.2d 741 (1987). In making our interpretation we owe no deference to the trial court's conclusion. See *Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, Syl. ¶ 3, 829 P.2d 884 (1992).

Before we commence our analysis of the limitation on the liability of the guarantors, we note that both parties agree the guaranty is unambiguous. Despite this agreement, the guarantors presented testimony at the trial, unobjected to by the lender, which tends to uphold the construction of the guaranty reached by the trial court. We will not consider or rely on this extrinsic evidence because it cannot be used to construe an unambiguous agreement.

The fact the parties differ as to what the guaranty unambiguously states does not force a finding of ambiguity. See *Amoco Production Co. v. Kansas Power & Light Co.*, 505 F. Supp. 628, 635 (D. Kan. 1980). A contract is not ambiguous merely because it does not address an issue. *Duffin v. Patrick*, 212 Kan. 772, Syl. ¶ 4, 512 P.2d 442 (1973).

If a contract is unambiguous, the court can look only to the four corners of the agreement to determine the parties' intent, harmonizing the language therein if possible. *Brown v. Lang*, 234 Kan. 610, Syl. ¶ 1, 2, 675 P.2d 842 (1984), *Wiles v. Wiles*, 202 Kan. 613, 619, 452 P.2d 271 (1969). See *Wood River Pipeline Co. v. Willbros Energy Services Co.*, 241 Kan. 580, Syl. ¶ 3, 738 P.2d 866 (1987) (unambiguous contracts will be enforced according to their plain, general, and common meaning in order to ensure the intentions of the parties).

The court cannot, under the guise of construction, rewrite the terms of the contract. *Quenzer v. Quenzer*, 225 Kan. 83, 85, 587 P.2d 880 (1978). "It is a cardinal rule . . . that courts will not rewrite a contract by construction if it is clear and unambiguous." *Thomas v. Thomas*, 250 Kan. 235, 244, 824 P.2d 971 (1992).

We do not question the lender's contention that the guaranty in issue is one of payment rather than collection. See 38 Am. Jur. 2d, Guaranty § 22. But, it does not automatically follow, as the lender contends, that its suggested construction of the limitation of the guaranty must be adopted.

Nor do we agree with the guarantors' contention that decisions such as *Iola State Bank v. Biggs*, 233 Kan. 450, 662 P.2d 563 (1983), and *Trego Wakeeney State Bank v. Maier*, 214 Kan. 169, 519 P.2d 743 (1974) compel the least restrictive construction possible in favor of the guarantors.

We *are* bound by the long-standing Kansas rule which was stated by Justice (now Chief Justice) Holmes in *Cornett v. Roth*, 233 Kan. 936, 942, 666 P.2d 1182 (1983), as follows:

"In *Failing Co. v. Cardwell Investment Co.*, 190 Kan. 509, 376 P.2d 892 (1962), Justice (now Chief Justice) Schroeder stated:

'The liability of a guarantor upon an obligation cannot be extended by implication, and he should not be held beyond the precise terms of his contract. (*Kepley v. Carter* 49 Kan. 72, 30 Pac. 182; and *Bank v. Bradley*, 61 Kan. 615, 60 Pac. 322.) The same rule was stated in *Dry Goods Co. v. Yearout*, 59 Kan. 684, 54 Pac. 1062, in the following language:

". . . A contract to pay the debt of another should not be expanded beyond the fair import of its terms. A guarantor, like a surety, is a favorite of the law, and he is not held unless an intention to bind himself is clearly manifested; and his liability is never to be extended beyond the precise terms of his obligation. . . ." (pp. 685, 686.)' pp. 515-16.

The court also stated:

'If the language of the contract of guaranty is clear and leaves no doubt as to the parties' intention concerning the measure of the guarantor's liability, the guarantor cannot be held liable in excess of the limitations that the contract language imposes.' pp. 516-17."

The trial court found, as the guarantors argue, that the guaranty can reasonably be interpreted to provide that the sale price of the collateral after foreclosure is to be applied in its entirety to the amount covered by the limited guaranty agreement to relieve the guarantors of liability for an amount equal to the full amount of the sale, regardless of its adequacy to cover the underlying debt. It is on this basis that the trial court appears to have reached its conclusion that since the sales price of the apartment complex exceeded one-third of the outstanding debt at the time of default, the guarantors are relieved from any liability in this action.

As we read the guaranty, it is devoid of any language which would support this interpretation. The guaranty does not purport to limit the lender's potential remedy but rather the guarantors'

obligation, which is stated to be "limited to an amount equal to one-third of the amount of the loan from time to time outstanding."

It is a basic rule of contract law that courts will allow parties to choose the terms by which they are bound under written agreements. See *Squires v. Woodbury*, 5 Kan. App. 2d 596, 598, 621 P.2d 443 (1980), *rev. denied* 229 Kan. 671 (1981). The guaranty does not state that the value of the collateral securing the underlying notes is to be credited to the obligation created by the guaranty, and it was erroneous for the trial court to so hold.

TMG argues the contract can be interpreted to mean that the guarantors' limitation becomes fixed upon default and that any proceeds from the sale of the collateral after foreclosure have no impact on the limit of the guaranty. TMG cites *Preston Ridge Financial Servs. v. Tyler*, 796 S.W.2d 772 (Tex. App. 1990), where it was held that a guaranty agreement contemplated that the proceeds of foreclosure be applied first to the unguaranteed portion of the debt. This argument ignores the fact that the contract at issue in *Preston Ridge* used language different from the one here. The same is true of *Woodruff v. Exchange Nat. Bank of Tampa*, 392 So. 2d 285, 285-86 (Fla. Dist. App. 1980); *Southern Bank & Trust Co. v. Harley*, 292 S.C. 340, 341-42, 356 S.E.2d 410 (Ct. App. 1987); and *Crown Life Ins. Co. v. LaBonte*, 111 Wis. 2d 26, 330 N.W.2d 201 (1983), all cited by TMG.

We will not create or provide TMG with a legal position which it could have clearly articulated in the documents it compelled the guarantors to sign but failed to do. "As with all problems of interpreting or construing contracts, the facts of each case are of extreme importance. Therefore . . . prior decisions are generally not controlling on questions involved in other contracts of guaranty." 38 Am. Jur. 2d, Guaranty § 70, p. 1071. In all of the cases upon which TMG relies, the limit on the guaranty was fixed rather than indexed to the outstanding debt. Regardless of the rule in such cases, the language in the contract before us provides that the guarantors' liability is limited to "one-third of the amount of the Loan *from time to time outstanding*." (Emphasis added.)

This language does not support the interpretation the lender seeks to give to the contract. The guaranty agreement does not

refer to the date of default as fixing the guarantors' liability but affirmatively and positively indicates the amount which is to be guaranteed is subject to change over the passage of time. There are not multiple, reasonable interpretations of the language of the guaranty which are presented to us.

The wording "from time to time outstanding" is usually used in documents of indebtedness to describe the amount on which interest is charged. See *Universal Metals and Machinery, Inc. v. Bohart*, 539 S.W.2d 874 (Tex. 1976). The statement "from time to time" in provisions of a promissory note are words of common speech and mean "at intervals" or "now and then." *Union Const. Co. v. Bene. Standard Mortg. Inv.*, 125 Ariz. 433, 438, 610 P.2d 67 (1980). In *Florey et al. v. Meeker et al.*, 194 Or. 257, 286, 240 P.2d 1177 (1952), the phrase "from time to time" was held to mean "as occasion may arise," "at intervals," "now and then occasionally." There is nothing positively stated in the guaranty giving the lender the right to enforce the guaranty at one time to the exclusion of another. Therefore, we must interpret the wording as of the time judgment is determined or when payment is made. We hold that the trial court is compelled to apply the express limitation of the guaranty to the amount due by the guarantors when their obligation is determined.

TMG argues that such a construction would convert the guaranty to one of collection rather than one of payment. Such might be true if we interpreted the contract to *require* the repossession or foreclosure of the collateral prior to collecting one-third of the outstanding debt from the guarantors. No language of the guaranty agreement imposes this requirement. But, in applying the wording of the guaranty's limitation to the facts as they now exist, when the lenders' repossession of the property took place before the amount of the guarantors' obligation was determined, by the language of its own contract, TMG limited its recovery to one-third of the amount then outstanding.

Rather than setting the guaranty at a fixed figure, it is indexed to the outstanding debt. In this way both parties are protected in future transactions. If the lender increases the credit extended to the partnership by virtue of unpaid interest or other charges on

the notes, it does so with the knowledge that the RCA partners will be individually liable for one-third of the new balance through the guaranty contract. If, on the other hand, the partnership reduces the amount of the outstanding loan through paying back principal, the guarantors benefit from that payment to the extent it reduces the total debt on which their liability is based.

Our interpretation of the guaranty as limiting the guarantors' liability to one-third of the outstanding loan amount at the time the guarantors pay is consistent with the interpretation given to nearly identical language in a similar guaranty agreement in *Federal Deposit Ins. Corp. v. Claycomb*, 945 F.2d 853 (5th Cir. 1991). The lender in *Claycomb* agreed that the guarantors would not be liable for an amount in excess of " 'one-half the total of all such amounts which are outstanding from time to time.' " 945 F.2d at 861.

The United States District Court for the Northern District of Texas rejected contentions that the amount was fixed at the time the guaranty came due and that, because the lender foreclosed and received more than half of the amount due from the guarantors, their liability was satisfied and extinguished. The court found this construction inconsistent with the "outstanding from time to time" language of the guaranty and held:

"These provisions limit liability to one-half of the indebtedness outstanding under each note for so long as any indebtedness is outstanding. The fact that the purchase price upon foreclosure of the collateral was in excess of the one-half of the amount owing on the notes does not eliminate defendants' obligations as guarantors but merely reduces their obligation to one-half of the remaining indebtedness outstanding." Memorandum opinion filed June 29, 1989, p. 8.

The Fifth Circuit in *Claycomb* expressly affirmed this conclusion:

"As the district court aptly instructs in its Memorandum Opinion and Order entered June 29, 1989, 'these provisions limit liability to one-half of the indebtedness outstanding under each note for as long as any indebtedness is outstanding.' In other words, that the foreclosure purchase price of collateral exceeded one-half of the amount owing on the notes does not eradicate the debt, but rather reduces guarantor's obligation to one-half the remaining indebtedness." *Claycomb*, 945 F.2d at 861, n.32.

Diligent counsel and our research have not found any other cases where the precise wording we here consider has been construed. We choose to follow our analysis and the decision in *Claycomb*. The liability of the guarantors is to be determined by the amount of the debt subject to the guaranty which is from time to time outstanding.

Because of its ruling, the trial court never decided the issues of the validity and extent of the obligations under the provisions in the notes relating to prepayment, default interest, and late charges. The decision we have reached above compels that each of these issues be decided.

*Is the prepayment premium included in the outstanding debt upon which the guarantors' limitation is based?*

The provision relating to prepayment is found in the mortgage notes and reads as follows:

"Prepayment. Prepayment of the principal sum due hereunder is permitted, in whole or in part, at any time and from time to time during the term of the Loan, so long as there is then no default hereunder or under the Mortgage or any of the Security Documents. Except for prepayment within ninety (90) days following the mailing to Borrower of notice of a change in interest rate, any prepayment shall be subject to a prepayment premium (the 'Premium'). The Premium shall be that percentage of the principal amount prepaid equivalent to one percent (1.0%) plus the amount, if any, by which ten and seven-eights percent (10.875%) exceeds the yield rate on U.S. Government treasury bills, bonds or notes (whichever is applicable) having at the time of prepayment a maturity within forty-five (45) days of the Adjustment Date, or if the Adjustment Date has passed, within forty-five (45) days of the date which is the tenth (10th) anniversary of the execution of this Note, such difference being divided by twelve (12) and multiplied by the number of whole and partial months from the date of payment to the Adjustment Date, or if such Adjustment Date has passed, to the tenth (10th) anniversary of the execution of this Note.

"Upon the occurrence of an event of default under this Note and following acceleration of maturity hereof by the Holder, a tender of payment of the amount necessary to satisfy the entire unpaid principal balance declared due and payable shall be deemed to constitute an attempted evasion of the aforesaid provisions on the right of prepayment and shall be deemed a prepayment hereunder and such payment must, therefore, include the applicable Premium described above."

In *Metropolitan Life Ins. Co. v. Strnad*, 255 Kan. 657, 665, 876 P.2d 1362 (1994), the discussions about prepayment clauses found

in *Overland Park Savings & Loan Ass'n v. Miller*, 243 Kan. 730, 733-34, 763 P.2d 1092 (1988), were summarized as follows:

"A lending institution obtains money from other sources and then in turn loans it out to the ultimate borrowers at interest rates which are higher than the rate being paid by the lending institution. The difference between the two rates, *i.e.*, the bank's and the borrower's, is the margin of profit from which the bank pays its operating expenses and makes its profit. When a bank loans a large sum of money for a lengthy period of time, it can protect itself by a prepayment clause because the interest rate it is paying to its lender can be locked in at the rate at which it must pay its sources. Should interest rates fall, the ultimate borrower would naturally refinance at the lower interest rate and prepay its loan to the bank. In that event, the bank would have to loan the money to new borrowers at the current, lower interest rate, but the bank would still be locked into paying its sources at the higher rate. Without such prepayment clauses, banks would be reluctant to make large, long-term loans during periods of high interest rates."

In support of the validity of the prepayment clause, TMG presented testimony showing the clause provided the lender with additional protection so it could receive the contractual benefit of the loan it made. In the insurance industry, premiums are invested with maturity periods equal to the time of expected claims so the expense and loss on short-term investments can be minimized. Prepayments upset the investment balance and require funds to be invested in shorter-term, lower-yielding investments to the lender's detriment, which justifies the additional amounts due from the borrower in the event of prepayment or default.

The guarantors contend the prepayment penalty cannot be assessed and is invalid for two reasons: First, there was never a tender of payment of "the amount necessary to satisfy the entire unpaid principal balance declared due and payable," and second, the prepayment premium clause is an unlawful penalty under Kansas law.

TMG contends the prepayment clause is valid and enforceable because the turning over of the complex under the bankruptcy plan was a tender of full payment of its claim, the premium is specifically stated to apply to prepayments "whether in whole or in part," and finally, the prepayment in issue here *is* enforceable under Kansas law.

In resolving this issue, we apply the previously cited rule that we are required to look to the four corners of the agreement, har-

monizing the language therein, if possible. See *Brown v. Lang,* 234 Kan. 610, Syl. ¶¶ 1, 2, and *Wiles v. Wiles,* 202 Kan. at 619. This requires us to consider the provision of the note dealing with defaults by the borrower, which specifically reads:

"Default; Late Charge. The whole of the principal sum and interest, *together with the prepayment premium (as defined herein)* and the costs and attorneys' fees incurred by the Holder hereof in collecting or enforcing payment thereof, *shall become due and payable at the option of the Holder hereof, after default* in the receipt of payment of any principal hereof, interest thereon, or the payment of any other sum due hereunder or under the terms of the Mortgages or the Security Documents, or after any other default in the performance of the covenants or terms of this Note or the Mortgages or the Security Documents securing this Note or any other Event of Default as such term is defined in the Mortgages or Security Documents, without notice, which notice is hereby waived by Borrower." (Emphasis added.)

The wording of this provision clearly states that the amount due upon default includes "the prepayment premium (as defined herein)." We cannot read one part of the note to the exclusion of another, see *Strnad,* 255 Kan. at 661, and the intent of the default provision in the note shows without question that the prepayment premium is a part of the amount due and payable in the event of default.

We reject the guarantors' argument that a tender of the entire indebtedness is required to trigger the prepayment penalty. This tender clause, read in concert with all the provisions of the note, prohibits a borrower from defaulting intentionally and tendering the unpaid balance without it also including the amount of "the applicable Premium described above."

This holding does not resolve this issue, for we now must decide if the prepayment penalty is prohibited under Kansas law, as the guarantors contend.

Both parties state the prepayment premium should be interpreted by the rules governing liquidated damages provisions. We, therefore, assume that the prepayment provision is intended to compensate the lender for the loss of its contract expectation rather than to provide an alternate means of contract performance. See *In re A.J. Lane & Co., Inc.,* 113 Bankr. 821, 827 (Bankr. D. Mass. 1990).

The underlying principles of our assumption were applied in an early case dealing with unauthorized delay in a construction project, where it was stated:

"Damages are allowed as compensation which the law affords to persons whose rights have been invaded; actual damages are for actual losses. The amount of such losses may, however, be anticipated, and the extent of a possible future loss, to be paid in the event of a breach of contract, may be agreed upon in advance, where there is difficulty in determining the extent of the loss and the resulting damages are uncertain, if the amount fixed is reasonable." *Railroad Co. v. Gaba*, 78 Kan. 432, 435-36, 97 Pac. 435 (1908).

*Beck v. Megli*, 153 Kan. 721, 726, 114 P.2d 305 (1941), sets forth in greater detail the rules for determining whether a contractual provision is an impermissible penalty or a valid liquidated damages clause:

"The instrument must be considered as a whole, and the situation of the parties, the nature of the subject matter and the circumstances surrounding its execution taken into account. There are two considerations which are given special weight in support of a holding that a contractual provision is for liquidated damages rather than a penalty—the first is that the amount stipulated is conscionable, that it is reasonable in view of the value of the subject matter of the contract and of the probable or presumptive loss in case of breach; and the second is that the nature of the transaction is such that the amount of actual damages resulting from default would not be easily and readily determinable."

Guarantors argue the prepayment premium provision is an unenforceable penalty because it fails the first aspect of this test—it is not a conscionable, reasonable estimation of actual damages. The burden of proving the liquidated damages clause is an unenforceable penalty falls upon the guarantors. See *In re Schaumberg Hotel Owner Ltd. Partnership*, 97 Bankr. 943, 953 (Bankr. N.D. Ill. 1989). A contract provision is conscionable unless it is, under the circumstances, "so outrageous and unfair in its wording or application that it shocks the conscience or offends the sensibilities of the court, or is against public policy." *Adams v. John Deere Co.*, 13 Kan. App. 2d 489, 492, 774 P.2d 355 (1989). Nothing in the circumstances surrounding the execution of the note meets this standard.

The formula used to calculate the prepayment premium is based on the outstanding principal at the time of prepayment and reflects

fluctuations in economic conditions between the execution of the mortgage and the time of prepayment. It is not a fixed charge regardless of the amount owing and unreasonable as an estimate of damages for that reason. See *In re American Metals Corp.*, 31 Bankr. 229 (Bankr. D. Kan. 1983) (fixed $20,000 termination charge was an unenforceable penalty). It does not guarantee equal damages regardless of whether the creditor is favored by early repayment because of rises in interest rates or damaged by loss of a rate of return no longer available in the market at the time of prepayment. See *In re A.J. Lane & Co., Inc.*, 113 Bankr. 821 (Bankr. D. Mass. 1990). Instead, it attempts to estimate the damages that the creditor might face as a result of prepayment under future market conditions unknown at the time of execution.

Guarantors rely on *In re Skyler Ridge*, 80 Bankr. 500 (Bankr. C.D. Cal. 1987), a California case purporting to apply Kansas law. The court noted Kansas would enforce liquidated damages provisions that are reasonable when actual damages would be difficult to ascertain but found unreasonable a penalty prepayment charge based on the difference between the mortgage interest rate and rate of interest paid by United States Treasury notes where the clause additionally did not discount the anticipated lost interest to present value. The court stated:

"The approximation of Travelers' potential lost interest is calculated by multiplying the amount of the prepayment by the difference in interest rates (contract rate minus reference rate) for the remaining term of the loan. However, instead of the market rate for first mortgages, the reference rate in the contract is the yield for U.S. Treasury notes due November, 1995. The interest rate on U.S. Treasury notes is systematically lower than the interest rate on first mortgages for construction loans on apartment buildings, because the risk is lower. The yield for U.S. Treasury notes runs approximately 1.3 to two percentage points below the market for first mortgages. . . .

"It would have been permissible for the parties to have chosen an index rate such as that for U.S. Treasury notes that differs from the market for long-term first mortgages, provided that some appropriate adjustment to bring this rate up to the first mortgage rate were included. However, the parties included no such adjustment in the formula in the promissory note. Thus the Court finds that this feature of the formula in the promissory note is unreasonable.

"The second deficiency in the formula in the promissory note is that it contains no discount for present value. Application of the formula would permit Travelers

to recover its entire lost interest at the time of prepayment, rather than over the life of the loan. Because there is no recognition of the time value of money in the formula, the Court finds that this feature of the formula is also unreasonable and cannot be upheld." 80 Bankr. at 505.

The court in *In re Kroh Bros. Development Co.*, 88 Bankr. 997 (Bankr. W.D. Mo. 1988), followed the reasoning of *Skyler Ridge* in finding that a prepayment charge was an unenforceable penalty under Missouri law.

The United States Bankruptcy Court for the eastern district of New York rejected the reasoning of *Skyler Ridge* in *In re Financial Ctr. Assoc. of East Meadow, L.P.*, 140 Bankr. 829, 835 (Bankr. E.D.N.Y. 1992):

"The real thrust of Debtor's argument in seeking to invalidate the pre-payment charge is that in light of the current market condition the formula chosen by the parties will result in a very large pre-payment charge. The Debtor argues that had the parties chosen an interest rate based upon mortgages of real property rather than upon United States Treasury Bonds, the pre-payment charge would have been considerably smaller. This argument is unpersuasive."

The court reasoned:

"*In re Skyler Ridge*, 80 B.R. 500 (Bankr. C.D. Cal. 1982) squarely supports Debtor's position. However, we refuse to follow it. First, *Skyler Ridge* appears to limit the freedom of contract of the parties by replacing the parties' judgment regarding the appropriate discount rate with the court's. . . .

. . . .

"The magnitude of the loan transaction and quality and quantity of the loan documents leave little doubt that here we have an arms-length transaction between adequately represented sophisticated businessmen. [Citation omitted.] Under these circumstances we feel . . . that it would be offensive to the basic notion of freedom of contract if the Debtor's argument were to prevail. Were we to accept the Debtor's position we would be granting borrowers a license to gamble with lenders' money regarding the discount rate applicable to prepayment charges, a gamble that can not fail: should the yield on Treasury Bonds go up, the Debtor honors the deal, if, however, the yield goes down, the Debtor moves to invalidate the pre-payment charge. Such a result offends our sense of fair play." 140 Bankr. at 837-38.

This reasoning is more consistent with Kansas law than the California Bankruptcy court's decision in *Skyler Ridge*. Our Supreme Court recently said, when considering a prepayment provision:

"American courts have traditionally taken the view that competent adults may make contracts on their own terms, provided they are neither illegal nor contrary to public policy and, in the absence of fraud, mistake, or duress, that a party who has fairly and voluntarily entered into such a contract is bound thereby, notwithstanding it was unwise or disadvantageous to that party." *Metropolitan Life Ins. Co. v. Strnad*, 255 Kan. 657, 670-71, 876 P.2d 1362 (1994).

Kansas courts allow the parties to choose the terms by which they will be bound under contract law. See *Squires v. Woodbury*, 5 Kan. App. 2d 596, 621 P.2d 443 (1980).

The *Skyler Ridge* analysis regarding the lower rate of return of U.S. Treasury notes is unpersuasive for another reason. There is testimony in the record that because of TMG's needs for a predictable stream of cash to pay its policy holders, investments of the same type as the original mortgage are not available as adequate substitutes upon reinvestment. Part of the damages TMG expected to incur as a result of prepayment is having to reinvest the funds at a lower rate of return than in the original mortgage. Hence, it is appropriate to use those lower return investments as an index in computing liquidated damages.

Guarantors complain Treasury notes do not accurately reflect TMG's actual damages because TMG reinvested in mortgage-backed securities rather than Treasury notes. This argument is not persuasive. The reasonableness of a liquidated damages clause should be determined as of the time the contract was executed, not with the benefit of hindsight. See 22 Am. Jur. 2d, Damages § 703.

As Guarantors argue, the failure to discount the interest recovered through the prepayment premium to present value gives the lender an effective interest rate in excess of the bargained-for rate of return from the mortgage. However, in determining whether a purported liquidated damages clause is conscionable and reasonable, we are required to look at the circumstances of the transaction and not view the prepayment clause in isolation. See *Megli*, 153 Kan. at 726; 22 Am. Jur. 2d, Damages § 706. In the absence of clear evidence to the contrary, when parties of equal sophistication negotiate a loan agreement, courts should presume that the creditor gave value, in the form of some other term of the agreement

or otherwise, for terms favorable to the creditor in calculating the discount rate and formula to be used in computing the prepayment premium. See *In re United Merchants & Mfrs., Inc.*, 674 F.2d 134, 137 (2d Cir. 1982). Moreover, "[t]he parties are not required to make the best estimation of damages, just one that is reasonable." *In re Schaumberg Hotel Owner Ltd. Partnership*, 97 Bankr. 943, 953 (Bankr. N.D. Ill. 1989). "It is immaterial that the actual damages suffered are higher or lower than the amount specified in the clause." 97 Bankr. at 953.

Guarantors also argue a prepayment premium is impermissible when prepayment is the result of the creditor's voluntary acceleration of the debt, citing *Matter of LHD Realty Corp.*, 726 F.2d 327 (7th Cir. 1984), which held:

"There are, however, some limitations upon the right to receive a prepayment premium. For one, the lender loses its right to a premium when it elects to accelerate the debt. [Citation omitted.] This is so because acceleration, by definition, advances the maturity date of the debt so that payment thereafter is not prepayment but is instead payment after maturity." 726 F.2d at 330-31.

For the same principle, Guarantors rely on *In re Planvest Equity Income Partners IV*, 94 Bankr. 644 (Bankr. D. Ariz. 1988); *3C Assoc. v. IC & LP Realty Co.*, 137 App. Div. 2d 439, 524 N.Y.S.2d 701 (1988); and *Nutman, Inc. v. Aetna Business Credit, Inc.*, 115 Misc. 2d 168, 453 N.Y.S.2d 586 (1982). None of these cases is controlling in the circumstances of this case. *In re Financial Ctr. Assoc. of East Meadow, L.P.*, 140 Bankr. 829, 835 (Bankr. E.D.N.Y. 1992) explains:

"It is not disputed that the agreement between the parties specifically provides for the pre-payment charge even in the event of acceleration. The cases cited by the Debtor do not appear to address this issue and none of them specifically hold that a contractual provision allowing the collection of a pre-payment charge upon lender's acceleration is prohibited or void. The *LHD* court cites exceptions to the general rule that voluntary acceleration denies the lender the right to collect the charge, 726 F.2d at 331 n. 5. The *3C Associates* court addressed a situation where '[t]he terms of paragraph 21 make clear that said sum is an obligation which becomes due and payable only if there is a *voluntary exercise* of the right to prepay.' [Citation omitted.] The same is true of *Nutman v. Aetna Business Credit*, 453 N.Y.S.2d 586. The *Planvest* court, relying on *LHD*, does not appear to prohibit such a provision: 'prepayment penalty provisions are *generally* interpreted to mean

that the penalty is allowed only where the pre-payment is voluntary.' 94 B.R. at 644 (emphasis added). . . .

"Moreover, *United Merchants and Manufacturers, Inc. v. Equitable Life*, 674 F.2d 134 (2d Cir. 1982), and *Parker Plaza West Partners v. UNUM Pension & Insurance*, 941 F.2d 349 (5th Cir. 1991), *reh. denied*, serve fatal blows to Debtor's position. The *United Merchants* court, refusing to follow 14 N.Y. Jur. Damages § 167 (1969), conducted its own survey of New York law and enforced a loan agreement provision that entitled the lender to receive a pre-payment charge resulting from lender's acceleration of the note. 674 F.2d at 140. *Parker Plaza* squarely holds such a contractual provision to be valid, enforceable and not against public policy."

Given the traditional Kansas respect for and protection of the freedom to contract, the reasoning last set out above is persuasive. The provision in the note specifically permitting a prepayment premium in the case of acceleration upon default is held not to violate public policy and is enforceable.

*Is interest at the post-default rate chargeable?*

This issue now requires our decision although it was not considered by the trial court.

The note executed by RCA contains the following provision:

"Default and Interest. If default be made in payment of the principal sum above mentioned, or any interest thereon or installment thereof, as herein provided, or upon acceleration of this Note, then interest on the amount which is in default shall be at a rate three percent (3%) per annum in excess of the interest rate then in effect."

Guarantors contend post-default interest is not collectible because it overcompensates TMG for its default costs when considered with the provisions allowing for recovery of late fees, attorney fees, and costs.

TMG argues the total indebtedness should include interest at the contract rate of 10.875% plus an additional 3% for the missed payments and an additional 3% of the balance due and owing from and after the date of acceleration.

This issue is governed by the recent Supreme Court case of *Wagnon v. Slawson Exploration Co.*, 255 Kan. 500, 509, 874 P.2d 659 (1994), where an increase in interest from 18% to 24% post-default was approved, with Justice Abbott specifically stating:

"Where parties freely contract for a higher interest rate upon the occurrence of a default, whether monetary or nonmonetary, and that higher interest rate is not otherwise illegal and is prospective from the date of default and not retroactive, it does not constitute a penalty regardless of the type of default, and is not prohibited by K.S.A. 16-205(a)."

*Kvassay v. Murray*, 15 Kan. App. 2d 426, 808 P.2d 896, *rev. denied* 248 Kan. 996 (1991), does not support the guarantors' arguments, which have no merit on this issue.

Not only was the increased interest rate on default freely contracted for, it is an economic recognition that the risk of loaning money is increased by default, as this case illustrates.

*Are late fees included as part of the amount due on acceleration?*

The provision in the note dealing with late fees reads as follows:

"Further, in the event that any monthly payment of principal and interest or any part thereof shall become overdue for a period in excess of five (5) days, a late charge of $.05 for each $1.00 so overdue may be charged by the Holder hereof, for the purpose of defraying the expenses incident to handling such delinquent payment."

The guarantors makes the same argument relating to the assessment of late charges as they do as to post-default rents, with the same result.

We have previously specifically held that late fees are not void on public policy grounds. See *Carnes v. Meadowbrook Executive Bldg. Corp.*, 17 Kan. App. 2d 292, 302, 836 P.2d 1212 (1992). Late fees compensate the lender for administration of late payments prior to acceleration and are properly recoverable without constituting duplicative recovery.

*Did the trial court err in finding the valuation of the apartment complex to be moot?*

Because of the result the trial court reached, it noted the valuation of the apartment complex was "somewhat moot," but then proceeded to make some gratuitous comments which the guarantors interpret as a factual determination that the complex had a fair market value of $3.6 million when it was turned over to TMG. We hold the trial court's comments cannot be so construed for the reasons hereafter set forth and that the valuation issue in this case remains undetermined.

We reject the guarantors' argument that because the trial court stated valuation was irrelevant as long as it determined the complex to be worth at least $3.6 million, it had in fact made such a finding. The trial court erroneously construed the guaranty to be satisfied based on TMG's receipt from the sale of the complex of one-third of the outstanding amount of the loan. This erroneous conclusion required no particular valuation of the complex at the time of transfer, and we hold that none was made.

TMG argues the trial court erred in failing to value the complex because the guarantors' liability is dependent on the value TMG received when the complex was transferred to it. We agree.

As we have held herein, valuation of the apartment complex at the time of transfer becomes necessary to compute guarantors' liability on the guaranty. On remand, the trial court is to determine the value of the complex when it was received by TMG and then deduct this amount from the gross amount outstanding under the loan to determine the amount upon which to apply the limitation of the guaranty.

*Did the trial court err in holding the guarantors liable to TMG for the net post-default rents?*

In ordering the guarantors to pay to TMG the net rents collected from the time of default until the transfer of the property, the trial court stated it did so because TMG "was the owner of the property and legally entitled to any rents remaining over payment of operating expenses." This reason is clearly erroneous because prior to the transfer of the property it was not owned by TMG, who could not have been entitled to the rents for the reason given in the trial court's opinion.

If, however, the trial court reaches the right result, its decision will be upheld even though it relied on the wrong ground or assigned an erroneous reason for its decision. *Bank of Kansas v. Davison*, 253 Kan. 780, 792, 861 P.2d 806 (1993). This compels us to examine whether TMG was entitled to the post-default rents because the notes, mortgages, and security agreements and assignment of leases and rents so provided.

The next sentence in the guaranty, after making the guarantors' liability "limited to an amount equal to one-third of the amount of

the loan from time to time outstanding," specifically provides: "The limitation of the preceding sentence shall not apply to the events and conditions under which the liability of Borrower and any General Partner of Borrower, continues without limitation under the Notes."

The notes limit recourse by the lender to the real estate and encumbered collateral, but then provide for personal liability of the borrower and guarantors by stating:

"Notwithstanding the foregoing, however, the Borrower and the general partner(s) of Borrower shall be jointly and severally liable to Holder to the same extent that they would be liable absent the foregoing non-recourse provision and notwithstanding any limitation of liability expressed in the Guarantee for: . . . (ii) any rents, issues, profits or income which have been collected by the Borrower from the Premises after the occurrence of an Event of Default hereunder, under the Mortgage, the Assignments of Leases or any other Security Document and *after Holder's exercise of its rights to demand payment of such rents under the terms of the Mortgage or the Assignment of Leases.*" (Emphasis added.)

Guarantors argue TMG was not entitled to post-default rents for three reasons: (1) because TMG failed to make a demand for rents as required by the above-quoted provision, (2) because TMG waived its claims for post-default rents against RCA, and (3) because the doctrine of res judicata binds this court to an implicit determination of the bankruptcy court that TMG was not entitled to post-default rents.

There was no evidence of any demand for rents as is clearly required by the language cited above. TMG excuses this deficiency by contending it was barred by the automatic stay in bankruptcy from doing so. It may have been barred from instituting proceedings outside the bankruptcy court, but it could have made the necessary and required exercise of its rights to the rents in the bankruptcy case and it clearly failed to do so. No demand was ever made, and TMG had no right to any rents collected by RCA post-default under the express terms of the note.

Additionally, TMG consented to RCA's use of the rent as cash collateral to pay operating expenses for the apartment complex without making the demand the notes required in order to maintain its rights to the post-default rents.

The documents in issue here (the note, mortgage, and security agreement of leases and rents) make the guarantors' liability contingent on the exercise of the right to demand rents because they are guarantors and not primarily liable. Again, the rule previously stated applies that a guarantor will not be held liable where the language of the guaranty provision or the note contains a condition precedent to liability which was not met. See *Cornett v. Roth*, 233 Kan. 936, 942, 666 P.2d 1182, 1187 (1983) (guarantor will not be liable in excess of limitation imposed by clear contract language).

The exercise of the right to demand post-default rents under the mortgage and assignment of leases is a matter governed by law:

"Under Kansas law, a mortgagee is entitled to rents collected after default and before the period of redemption if (1) the mortgage conveys or assigns those rents to the mortgagee, and (2) the mortgagee takes possession or control of the rents by proper legal action, such as a receivership proceeding. [Citations omitted.] We hold that a mortgage provision conveying the rents to the mortgagee is enforceable in Kansas, as to rents collected after default and before the period of redemption, *if the mortgagee takes proper legal action to reduce the rents to its possession.*" (Emphasis added.) *Missouri Valley Investment Co. v. Curtis*, 12 Kan. App. 2d 386, 388, 745 P.2d 683 (1987).

In Kansas, the assignment of rents as security for a mortgage does not automatically vest the mortgagee with title to the rents at default. "[A] purely executory agreement alone is not effective to vest in a mortgagee the right to rents and profits. See generally *Hall v. Goldsworthy*, 136 Kan. 247, 249-51, 14 P.2d 659 (1932)." *Hoelting Enterprises v. Trailridge Investors, L.P.*, 17 Kan. App. 777, 783, 844 P.2d 745, *rev. denied* 252 Kan. 1092 (1993).

In *Holton B. & L. Ass'n v. Gibson*, 139 Kan. 829, Syl. ¶ 1, 33 P.2d 138 (1934), our Supreme Court held:

"Where a note and mortgage provide that 'rents and income are assigned' to mortgagee, and further that on default the mortgagee will be entitled 'to take charge of the said property, collect and receipt for all rents and income and apply the same on payments, insurance premiums, taxes, dues, repairs and improvements,' such stipulation is not invalid as to rents accruing after default and before the beginning of the statutory period of redemption, but the right to the benefit of such stipulation does not accrue until such rents and profits have been subjected to the possession of the mortgagee by a proper action in the courts."

In *Hoelting Enterprises,* 17 Kan. App. 2d 777, a case very similar to the one before us, the question for determination was whether a mortgagee with an assignment of rents was entitled to post-default rents when it initiated a foreclosure action that was stayed by a bankruptcy proceeding. The mortgagor argued that the mortgagee was not entitled to the rents because there had been neither the appointment of a receiver nor any other successful legal action vesting the mortgagee with rights to the rents. We held: "We are convinced and so hold that a mortgagee's right to receive rents and profits validly assigned to it vests when the mortgagee initiates proper legal action to enforce its right." 17 Kan. App. 2d at 785.

No foreclosure action was instituted here, nor was there any attempt to obtain a receivership to claim rents filed prior to the bankruptcy proceedings. No initial claim to rents or demand therefore was filed until well into the bankruptcy proceeding, and even that claim was withdrawn.

The claim for rents asserted here was made in November 1992 after the property had been transferred to TMG in June 1992. TMG did not vest its rights to post-default rents as required by the loan documents and has no such rights against the guarantors.

TMG's claim that RCA's bankruptcy precluded it from establishing its rights to post-default rents has no merit. Likewise, we reject TMG's argument that the provisions of the guaranty stating each guarantor waives any defense arising as the result of any election by the lender in any bankruptcy proceeding excuses an action which the loan documents required and it failed to take.

We are not unaware of the persuasive arguments made by guarantors that TMG waived any claim to post-default rents in the bankruptcy case and were further precluded from judgment for the net rents by virtue of the unappealed judgment in the bankruptcy case, but we need not reach these arguments because we hold the trial court's decision on this issue must be reversed for the reasons above stated.

In summary, we reverse the trial court and remand for further action in accordance with this opinion. The amount of the guarantors' liability to TMG shall be computed by the trial court by first making a factual determination of the fair market value of the

apartment complex as of June 22, 1992, when it was conveyed to TMG. This amount is to be deducted from the gross amount of the loan outstanding, consisting of principal, interest, late charges prior to default, post-default interest, and the prepayment premium. The resulting figure is the amount of the entire debt to which the one-third limitation is to be applied in granting judgment to TMG for the amount of the guarantors' liability herein. On that amount, allowed interest shall accrue until paid.

The trial court's order requiring payment by the guarantors of accumulated net rents in the sum of $300,000 is reversed.